George A. WELLS, Plaintiff-Appellant,

v.

Jack V. DOLAND, et al.,
Defendants-Appellees.

No. 83–4005
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Aug. 8, 1983.

Sumpter & Schrumpf, Charles Schrumpf, Oliver Schrumpf, Sulphur, La., for plaintiff-appellant.

Winston G. DeCuir, Asst. Atty. Gen., Baton Rouge, La., for defendants-appellees.

Before REAVLEY, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The appellant George A. Wells filed this 42 U.S.C. § 1983 suit against the President of McNeese State University and other university and Board of Trustees officials, requesting a determination that he is a tenured professor with the university, reinstatement, back pay and punitive damages, and a hearing to clear his name for alleged damage to his reputation incurred during his termination. Wells additionally sought a declaration that the university tenure requirements violated the fourteenth amendment. The district court granted summary judgment in favor of the defendants on all issues after finding that Wells, a non-tenured professor, had no property interest in continued employment and thus had no right to a hearing, and that the tenure requirements comported with the fourteenth amendment. Wells has timely appealed this finding. We affirm the judgment as to the tenure issues but must remand for further proceedings on the damage to reputation issue.

I.

The appellant George A. Wells was hired as an assistant professor and coordinator of the Criminal Justice Program at McNeese State University in Lake Charles, Louisiana, in the fall of 1975. At that time the tenure regulations of the Louisiana Board of Trustees for State Colleges and Universities allowed assistant professors to attain tenure by five consecutive years of service. The regulations further provided, however, that "if a faculty member breaks his consecutive years of teaching by a sabbatical leave or a leave without pay, the non-tenured faculty member must begin anew his period of five consecutive years." The tenure policies were changed in 1976 to allow an assistant professor to earn tenure in seven consecutive years during which leaves without pay or sabbatical leaves would not interrupt the seven-year period. Wells taught during the academic years 1975–76 and 1976–77. During 1977–78 Wells took a one-year leave of absence without pay to work on his doctorate degree. The leave was approved by the Louisiana Board of Trustees. Wells resumed his teaching duties in 1978 and continued to teach until he was issued a terminal contract by the university in August 1981.

Wells was recommended for tenure on two separate occasions at the request of the then-dean of the School of Humanities, John M. Norris, Jr. Pursuant to the requests, the recommendations from Dr. C.W. Fogleman, then head of the Department of Social Sciences, were made on July 14, 1978, and July 22, 1980. In the fall of 1980, Richey A. Novak replaced Dean Norris as the new Dean of Liberal Arts,[1] and in the summer of 1981, Dr. Fogleman was replaced by Dr. John Vile as head of the Department of Social Sciences. Dr. Vile notified Wells shortly thereafter that he intended to issue him a terminal contract.[2] The terminal contract was issued August 1981 by Jack V. Doland, President of McNeese University, and Richey A. Novak, Dean of Liberal Arts, on the recommendation of Dr. Vile, and was approved by the Louisiana Board of Trustees.

Vile's reasons for not recommending tenure for Wells included Wells' lack of a terminal degree, complaints about Wells' teaching and lack of leadership, and Wells' poor reputation in the law enforcement community.[3]

Wells sought a review of the defendants' decision to deny him tenure by appealing to the McNeese Merit, Promotion and Tenure Committee. The only issue discussed at that hearing was whether Wells was tenured. The committee found that he was not and affirmed the defendants' decision. Wells subsequently appealed to the Louisiana Board of Trustees which denied the appeal.

Wells filed the instant suit April 30, 1982. His complaint averred that he had been denied due process because the reasons given for his termination attacked "his good name, reputation, and integrity so as to possibly deprive him of future state employment [and] caus[ed] damage to his professional reputation ...." He sought a declaratory judgment that he was in fact tenured, an injunction to prohibit his termination or reinstatement plus back pay, damages for injury to his professional reputation, punitive damages, and alternatively, a meaningful hearing on the reasons for his termination.

Wells amended his complaint in September 1982 to allege that both the pre-1976

---

1. Although irrelevant to our decision, the complaint is unclear as to whether the School of Humanities and the School of Liberal Arts are one and the same. In Wells' brief to us, however, the two are treated as one.

2. We can find neither an explanation nor a copy of the terminal contract in the record before us. As we understand it, however, the contract under which Wells taught at the university during 1981–82 indicated that this represented his last year to teach at McNeese State and that the university had decided not to offer him tenure.

3. Vile's reasons for terminating the appellant as cited in Wells' complaint and uncontroverted by the defendants include:
(a) a desire to upgrade the department by denying tenure to personnel without a terminal degree;
(b) complaints from students and professors about Wells' teaching and leadership;
(c) student disappointment in Wells' teaching because he read directly from the course text, rarely brought in outside information, persistently let classes out early, and was an unfair grader, consistently grading females easier than males;
(d) a belief that Wells intimidated students;

(e) student belief that the Criminal Justice Program lacked adequate direction and that Wells' poor reputation in the law enforcement community damaged the university's image;
(f) other faculty members' reservations about Wells' teaching, image in the community, and leadership of the Criminal Justice Program;
(g) negative comments about Wells from outsiders;
(h) a desire to see greater direction given the Criminal Justice Program which under Wells' leadership had produced fewer field trips, reduced activities with the law enforcement fraternity, less enthusiasm for the program, declining enrollments, and a poor image in the community and within the university;
(i) Wells' censure on several occasions by Dr. Norris, former Dean of the School of Humanities;
(j) Wells' waning enthusiasm for the Criminal Justice Program and his failure to provide leadership in recommending adjunct professors, responding to requests for information, advising students, and providing liaison activities with local law enforcement agencies.
According to Wells, President Doland stated that he would terminate Wells for failure to have a Ph.D. degree even if a hearing found that all of the other reasons for termination were invalid.

and the 1976 tenure regulations violated the Equal Protection Clause of the fourteenth amendment in that the requirements bore no rational relation to any government interests.

The defendants filed a motion for summary judgment, claiming that Wells had not met the tenure requirements under either the pre-1976 or the 1976 tenure regulations, that he had not received de facto tenure because even though he had been recommended for tenure he had not met the formal requirements, that his termination was in accordance with law, that he had been accorded a due process hearing before the University Merit, Promotion and Tenure Committee and Tenure Appeals Committee, and that the regulations did not violate Wells' equal protection rights.

Wells opposed the motion by affidavits relating to his de facto tenure and equal protection arguments and by memoranda claiming that genuine issues of fact existed as to whether he had earned tenure and whether he had received a due process hearing to respond to charges which seriously damaged his standing and associations in the community.[4]

The district court found that the reasons given for Wells' termination [5] were not constitutionally impermissible and that the state thus had a right to terminate him. The court further found that Wells had satisfied neither the pre-1976 nor the 1976 tenure requirements and that there was no evidence that McNeese University followed a "de facto" tenure plan, but rather that the university followed a formal, published set of tenure regulations. It thus found that Wells' expectation of employment was not a constitutionally protected property right and that Wells, therefore, had no constitutional right to a hearing following his termination. It finally found that Wells had not suggested that he was a member of a "suspect class" or that the defendants had interfered with his fundamental rights by denying him tenure. The court thus used a relaxed standard in weighing the equal protection claim and found that the tenure regulations promoted a legitimate state interest and that they had not been applied in an irrational or arbitrary manner. Wells has made a timely appeal of this judgment.

II.

On appeal Wells challenges each of the trial court's findings. He first argues that the court erred in finding that he had no expectation of employment since he had been teaching at the university for six years (including his one-year approved leave of absence) and had been recommended twice for tenure at the time he received his terminal contract.

His equal protection argument asserts that McNeese University has applied the tenure requirements arbitrarily and capriciously, since the university gave tenure to a professor who, although he met the seven-year consecutive service requirement, had taken three one-year leaves of absence, and thus had less actual teaching experience than did Wells who had taught five of the six years that he had been at McNeese prior to receipt of his terminal contract. Moreover, according to the argument, since a teacher can be evaluated only while he is on campus and teaching, consecutive years of

4. As far as the record shows, Wells did not respond by memorandum to the defendants' motion for summary judgment on his amended complaint, i.e., his equal protection claim against the tenure regulations, and we do not have a record of a hearing on the motion. His statement of issues for appeal to the trial court, however, claims that the court erred in finding the tenure regulations constitutional based on actual teaching time as evidenced by one of the affidavits that he submitted showing that a professor who had less actual teaching time than did Wells had been tenured (although the professor met the seven-year requirement of the 1976 tenure regulations).

5. The trial court summarized the reasons shown in the complaint for termination, see supra note 3, as follows: (1) that the defendants wanted to upgrade the department by replacing plaintiff, who held only a master's degree, with a teacher holding a doctorate; (2) that defendants had received complaints about plaintiff's official performance; and (3) that defendants believed plaintiff's effectiveness as a teacher was on the wane.

service requirements which include leaves of absence are irrational.

Finally, Wells contends that there is a genuine issue of material fact regarding whether the reasons for termination (other than the lack of a Ph.D.) were correct, whether these reasons damaged his "good name, reputation, honor, and integrity," and whether he was provided a meaningful hearing to refute these charges.

### A.

■ Wells' first two arguments were correctly resolved by the district court. Wells' tenure argument is based on an assertion that he had received de facto tenure. There was, however, no evidence before the court to indicate that McNeese University utilized a de facto tenure policy generally or in regard to the appellant. *Cf. Perry v. Sindermann,* 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). Moreover, there was no evidence to indicate that merely recommending tenure for an associate professor was tantamount to granting tenure at the university. Thus Wells' mere subjective expectancy of continued employment, even though he had not attained the required years of service for tenure, did not give him the constitutionally protected property interests necessary to invoke the fourteenth amendment's procedural due process provisions. *Perry v. Sindermann,* 408 U.S. at 603, 92 S.Ct. at 2700; *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Hillis v. Stephen F. Austin State University,* 665 F.2d 547, 552 (5th Cir.1982). We also agree that the university could deny tenure to Wells for the reasons given. *Bishop v. Wood,* 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976); *Megill v. Board of Regents of State of Florida,* 541 F.2d 1073, 1077 (5th Cir.1976).[6]

**6.** In *Megill* this court stated that "a state could deny tenure to the plaintiff for no reason, a reason based on erroneous facts, or for any reason it chose, except for a reason that violated the plaintiff's constitutional rights." *Megill,* 541 F.2d at 1077.

### B.

■ The district court also correctly decided Wells' equal protection claims. The tenure regulations, pre-1976 or 1976, promote a legitimate Louisiana interest in furthering permanency in the teaching force of its universities and in insuring a more competent teaching staff. Moreover, the mere fact that a professor with less actual classroom teaching experience than Wells had was granted tenure does not make the regulations unconstitutional. Mathematical perfection is not required of a statutory distinction which burdens neither a suspect class nor a fundamental interest. *Vance v. Bradley,* 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979).

### C.

Since this case comes to us on a grant of summary judgment, however, we agree that a genuine issue of material fact exists in regard to Wells' due process claim of deprivation of a liberty interest, and that a remand is necessary.

■ The district court correctly found that a non-tenured professor has no constitutional right to a hearing absent a protected property or liberty interest. *Hillis,* 665 F.2d at 552. The court, however, did not discuss whether Wells had a protected *liberty* interest; the discussion was directed solely to whether Wells had a constitutionally protected *property* interest. It is thus unclear whether the district court implicitly found that the charges did not amount to a deprivation of liberty, *see supra* note 5, or whether the district court merely merged the liberty interest with the property interest. Since the record is obscure on this issue, we must remand.

■ The due process clause protects against arbitrary deprivation of both property and liberty interests. *In re Selcraig,*

None of the reasons cited for Wells' termination is constitutionally impermissible. Neither do the allegations in Wells' complaint or in his brief to us establish that his discharge was premised on race, religion or the assertion of constitutional rights. The denial of tenure was thus constitutional.

705 F.2d 789 at 795–796 (5th Cir.1983). That Wells had no constitutionally protected property interest does not preclude a finding that he had a protected liberty interest.

■ The liberty protected by the due process clause encompasses an individual's freedom to work and earn a living. *Bollow v. Federal Reserve Bank of San Francisco,* 650 F.2d 1093, 1100 (9th Cir.1981). When a public employer, in refusing to rehire an employee, makes charges against him that might seriously damage his standing in the community or otherwise imposes a stigma on the employee that forecloses his freedom to take advantage of other employment opportunities, the employee's liberty interest may be implicated and he should be granted the opportunity of a hearing to clear his name. *Board of Regents v. Roth,* 408 U.S. at 573–75, 92 S.Ct. at 207–08; *White v. Thomas,* 660 F.2d 680, 684 (5th Cir.1981).

■ To establish a liberty interest sufficient to implicate the fourteenth amendment's safeguards, the employee must show not only that he has been stigmatized,[7] but that he was stigmatized in or as a result of the discharge process, *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 341 (5th Cir.1978); that the

charges were made public, *Ortwein v. Mackey,* 511 F.2d 696, 699 (5th Cir.1975);[8] and that he was denied a meaningful hearing to clear his name. *In re Selcraig,* at 795–796.

■ In the instant case, Wells claims that the reasons given for his discharge are false and have harmed his reputation and standing in the community. In their brief to us, the appellees have failed to respond to this issue.[9] Moreover, we are unable to determine from the record whether these charges were ever made public. *See supra* note 8. Nor has there been a finding that such charges, if false, are the sort that might seriously damage Wells' standing in the community or foreclose his freedom to take advantage of other employment opportunities.

We thus remand to the district court on this issue alone. If the district court finds that the reasons given for dismissing Wells were false, that they were made public, that they could seriously stigmatize Wells as that term has been discussed earlier[10] and that the university failed to provide Wells with a meaningful opportunity to clear his name, the court will order the university to provide Wells with a hearing to refute the charges.

---

**7.** Inherent in this requirement is a finding that the charges not only seriously damaged the employee's standing and association in the community or foreclosed his freedom to take advantage of other employment opportunities, but that the charges are false. *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977).

**8.** *Ortwein* discussed this court's en banc holding in *Sims v. Fox,* 505 F.2d 857, 864 (5th Cir.1974) (en banc) that the mere presence of derogatory information in confidential files does not infringe an individual's liberty interest and stated the corollary that infringement of one's liberty interest is found only where the governmental agency has made or is likely to make the allegedly stigmatizing charges public "in any official or intentional manner, other than in connection with the defense of related legal action." *Ortwein,* 511 F.2d at 699.

In finding that there had been no allegation that the university at issue had made public the reasons underlying its decision not to renew the plaintiff's employment contract, the court

noted that counsel for the university had stated that no one *outside* the university "has ever been made aware of the reasons for the non-renewal of the plaintiff's contract." *Ortwein,* 511 F.2d at 699 & n. 3.

**9.** In its motion for summary judgment below, however, the university defendants claimed that Wells had received a hearing. Whether the hearing embodied Wells' liberty interest claim is unclear. At any rate, a genuine issue of material fact exists in regard to whether Wells received an opportunity to clear his name.

**10.** In so determining this factor, the district court should keep in mind that "mere proof . . . that [Wells'] record of non-retention in [this] job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Board of Regents v. Roth,* 408 U.S. at 474 n. 13, 92 S.Ct. at 2707–08 n. 13. *See also Codd v. Velger,* 429 U.S. at 638–39 & n. 11, 97 S.Ct. at 889–90 & n. 11 (Stevens, J. dissenting).

Because we have already held that the university could constitutionally discharge Wells, the university is under no obligation to rehire Wells, regardless of whether any or all of the reasons offered for his non-retention prove to be false. *See Dennis,* 577 F.2d at 344 (5th Cir.1978). The proper remedy, if Wells' liberty interest has been implicated, thus does not include reinstatement and backpay.

 As further guidance to the district court on remand, we note that the fourteenth amendment does not protect reputation per se against state infringement. *In re Selcraig,* at 796–797. Thus Wells' damage claims, if any, must necessarily relate to injury resulting from a denial of procedural protection.[11] Moreover, to recover punitive damages, Wells must establish all other elements of his liberty interest claim in addition to showing that the individual defendants made the charges maliciously. *In re Selcraig,* at 797.[12] The damage claims, as with the principal claim itself, must be decided by the district court itself in the first instance. Obviously, if Wells cannot establish all elements of his primary liberty deprivation claim, the damages issue is moot.

For the reasons stated above, we affirm the district court's judgment on the property interest (tenure) and equal protection claims, and remand for further proceedings on the liberty deprivation claim.

AFFIRMED IN PART AND REMANDED.

---

**11.** The Supreme Court's decision in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), is instructive on the types of damages allowed for a procedural due process violation. There the Court held *inter alia* that to recover an award of compensatory damages for a deprivation of procedural due process, the plaintiff must present proof of actual injury. *Carey v. Piphus,* 435 U.S. at 263–64, 98 S.Ct. at 1052. The Court concluded, however, that nominal damages (in that case one dollar) are recoverable for denial of procedural due process without proof of actual injury. 435 U.S. at 266–67, 98 S.Ct. at 1054. *See also Wilson v. Taylor,* 658 F.2d 1021, 1032–33 (5th Cir.1982) (damages for deprivation of procedural due process).

**12.** *See also Thomas v. City of New Orleans,* 687 F.2d 80, 83–84 (5th Cir.1982) (punitive damages in a civil rights action may be imposed only if the conduct that violates the plaintiff's constitutional rights is "malicious, wanton or oppressive" or was in reckless disregard for the plaintiff's rights).