861 F.2d 720
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Dr. Pradip GHOSH, Plaintiff-Appellant (87-3899)
Plaintiff-Appellee (87-4115),
v.
OHIO UNIVERSITY, Dr. Charles Ping, Dr. James Bruning, and
Board of Trustees of Ohio University,
Defendants-Appellees (87-3899).
Defendants-Appellants (87-4115)
 Nos. 87-3899, 87-4115.
 United States Court of Appeals, Sixth Circuit.
 Nov. 8, 1988.
 
 Before WELLFORD and BOGGS, Circuit Judges and BAILEY BROWN, Senior Circuit Judges.
 PER CURIAM.
 
 
 1
 This is an action for equitable relief under 42 U.S.C. Secs. 1981 and 1983. Plaintiff-appellant, Pradip K. Ghosh ("Ghosh"), sought reinstatement to his position as a nontenured professor of Afro-American Studies at Ohio University. Ghosh claimed that Ohio University discriminated against him based on his national origin (Indian), refused to renew his teaching contract in retaliation for exercising his first amendment rights, and denied him due process of law by refusing to allow him to respond to an unfavorable letter written during the process of his department's reappointment evaluation.
 
 
 2
 After the district court held in favor of Ohio University on all issues, Ghosh appealed on his first amendment and due process claims, but did not pursue further the decision denying his national origin claim. Ohio University also sought to recover attorneys' fees under 42 U.S.C. Sec. 1988. The request was denied and Ohio University cross-appealed.
 
 
 3
 For the reasons stated below, we affirm the decision of the district court.
 
 I. BACKGROUND
 
 4
 Ghosh, a native of India, has resided in the United States for over twenty years and holds a Ph.D. in Sociology and Social Engineering from the University of New York at Buffalo. In June 1979, while teaching at Southern University in Louisiana, Ghosh responded to an ad in the Chronicle of Higher Education announcing the availability of a position as "assistant/associate professor of Urban and/or Rural Development." This ad was placed by the Center for Afro-American Studies at Ohio University, which held the status of a separate college at the time. Ghosh was hired to fill this position, with the understanding that one of his responsibilities would be to establish an Institute for Urban and Rural Studies to help boost enrollment. Before arriving at Ohio University, Ghosh unsuccessfully sought a grant from the National Science Foundation to help fund the proposed Institute.
 
 
 5
 Ghosh arrived at Ohio University in January 1980. Due to low enrollment and the resignation of its dean, the Center for Afro-American Studies was merged into the College of Arts and Sciences on July 1, 1980. Interest in developing an Institute for Urban and Rural Studies faded, and the effort was "combined" with an existing effort to develop an institute focusing solely on rural affairs. This rural "institute-in-formation" was begun in 1976 by Mark Weinberg, who had successfully obtained grants and other outside funding for this program. Although Ghosh was invited to join the steering committee and to help establish the rural studies institute, his participation with the steering committee was minimal. Ghosh was upset when Weinberg, a white whom Ghosh felt was less qualified than he, was formally selected by the University to coordinate the institute in September of 1980. Ghosh complained to the Dean about Weinberg's selection, but to no avail.
 
 
 6
 In 1980, Dr. Rose, the head of Ghosh's department, gave Ghosh a favorable performance evaluation. By 1981, however, the relationship between Ghosh and the University had begun to deteriorate. Ghosh had, in the interim, complained about a graduate summer school course that he was scheduled to teach which was cancelled due to insufficient enrollment. Ghosh agreed to teach the course without pay, a not uncommon situation among professors teaching summer school. Ghosh also had become upset when he discovered that another professor, who was teaching an undergraduate course which had been cancelled due to lack of enrollment and then rescheduled, was being paid for her efforts even though she was teaching fewer students than he was teaching. In August 1981, Ghosh sent a series of letters to the administration demanding that he be paid. The University explained that the decision to pay certain professors to teach classes that initially had been cancelled due to lack of enrollment was based on whether the course was essential to a certain major. The Dean's office decided that the undergraduate course was a core course but that Ghosh's graduate course was not a core course.
 
 
 7
 Also in 1981, Ghosh's merit rating was lowered from a six to a five (on a ten-point scale). Dr. Rose initially gave Ghosh a score of six. When Dean Dorrill received Rose's evaluation he felt that Rose had overevaluated Ghosh and requested him to reconsider the recommendation.[1] Rose lowered Ghosh's evaluation. The lowered evaluation resulted in the reduction of Ghosh's salary for the upcoming teaching year.
 
 
 8
 On July 24, 1981, Ghosh wrote a letter to Dr. Rose complaining about the reduction of his faculty evaluation rating and on the same date, he wrote to Associate Dean Borchert objecting to the cancellation of his summer course and requesting payment for his teaching effort. Ghosh characterized these letters as grievances. Because Ghosh was not satisfied with the responses he received to either letter, he brought these matters to the attention of Dean Dorrill in a meeting held in August of 1981. In August, he also wrote to Acting Provost, James Bruning, regarding the nonpayment of summer teaching. In that letter, Ghosh claims that Dean Dorrill threatened him with termination for filing these grievances and further alleges that the nonrenewal of his teaching contract was in retaliation for filing these grievances.
 
 
 9
 On November 14, 1981, Ghosh was notified that his teaching contract would not be renewed beyond November of 1982. This decision was based upon the results of a standard evaluation procedure wherein a committee consisting of the chairman and two tenured faculty members of the Center for Afro-American Studies evaluated Ghosh's performance. Ghosh was invited to appear before the committee, but he declined to do so. After reviewing Ghosh's performance, the committee recommended nonrenewal. This recommendation was based upon lack of student enrollment in Ghosh's courses, Ghosh's failure to develop courses appropriate to the curriculum of Afro-American Studies, and his lack of interest in re-orienting his efforts toward Afro-American Studies.
 
 
 10
 The department of Afro-American Studies also requested the Dean's office to evaluate Ghosh's administrative performance. This task was assigned to Associate Dean Borchert, who then proceeded to investigate Ghosh's performance with various deans, department chairmen, and faculty members who had worked with Ghosh. Borchert also reviewed Ghosh's personnel file. On August 4, 1981, Dean Borchert reported that Ghosh had "failed entirely to demonstrate the qualities of leadership skill necessary."
 
 
 11
 On December 4, 1981, Ghosh submitted a formal grievance to Dean Dorrill wherein he outlined his version of the various events which had occurred during his employment at Ohio University. Ghosh's grievance was treated as a nonreappointment grievance under section II(D)(6) of the Ohio University faculty handbook. Dean Dorrill responded in detail to each of the allegations contained in Ghosh's grievance and concluded:
 
 
 12
 Having assessed very carefully your submitted materials relative to your non-reappointment grievance, I am led to the conclusion that your claims of broken commitments and conspiracy are without foundation in fact, and that your grievance merits no redress.
 
 
 13
 After receiving Dean Dorrill's response to his grievance, Ghosh appealed the matter to the University Provost, Dr. James Bruning, who asked Associate Provost, Dr. David Stewart, to assist him in reviewing Ghosh's grievance and the Dean's response. Dr. Stewart reviewed and analyzed both documents and recommended that the Dean's decision be sustained. The Provost concluded that there were no grounds for the grievance, and informed Ghosh that he concurred with Dean Dorrill's response to his grievance.
 
 
 14
 Ghosh then appealed his grievance to the faculty senate. The appeal was referred to Dr. Calvin Thayer, Chairman of the Promotion and Tenure Committee. Dr. Thayer's committee investigated Ghosh's grievance to determine whether or not there had been a violation of academic freedom, a failure to adequately consider his complaints, or a violation of due process as claimed by Ghosh. A meeting was scheduled with Ghosh, and all eight members attended and asked questions. The committee conducted its own investigation and personally interviewed Dean Porter, Professor Rose, Dean Borchert, Dean Dorrill, and others. The committee issued its report to the chairman of the faculty senate finding unanimously that Ghosh's substantive rights under the faculty handbook had been violated. The district court found that Ghosh's grievance was handled in accordance with the Ohio University faculty handbook procedures.
 
 II. FREEDOM OF SPEECH
 
 15
 The first issue considered was whether the nonrenewal of Ghosh's contract was an act of retaliation infringing on his first amendment rights. When a public employee claims that his dismissal deprived him of a constitutional liberty interest without due process, the reviewing court must engage in a multistage analysis. First, the employee must demonstrate that his conduct was protected. Second, the employee must demonstrate that the protected conduct was a substantial or motivating factor in the decision to dismiss. Finally, the employer may show that the dismissal would have occurred even in the absence of the protected conduct. See Trotman v. Board of Trustees of Lincoln University, 635 F.2d 216, 219 (3d Cir.1980), cert. denied, 451 U.S. 986 (1981).
 
 
 16
 In Pickering v. Board of Education, 391 U.S. 563 (1968), the Supreme Court established a qualified protection for the speech of public school teachers. Pickering mandated a balancing test to determine when a public school teacher may communicate in public without fear of retaliation by the state. The test recognizes that a state "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. at 568. Although the Court did not furnish absolute guidelines, it indicated that the employee's interest in expression must be weighed against the employer's expectations of "promoting the efficiency of the public services it performs through its employees." Id.
 
 
 17
 In 1983, the speech protection afforded public employees was narrowed significantly by Connick v. Myers, 461 U.S. 138 (1983). As articulated in Pickering, the employee must show that his activity was protected. Under Connick, this initial issue involves two subordinate inquiries of law: (1) whether the conduct involved a "matter of public concern," and (2) whether the employee's right of communication outweighed the efficient operation of the public employer.
 
 
 18
 Connick concluded that the "public concern" factor was paramount in the balancing test. Federal courts should review a personnel decision of a public employee only when it involves the employee's speech about matters of public concern. Id. at 147-48. Absent an issue of public concern, courts need not address the remaining balancing considerations, and Pickering protection does not apply. Id. Unfortunately, the Court failed to set forth a clear standard for identifying a matter of "public concern"; each such determination must be made on an ad hoc basis.
 
 
 19
 Given the facts in Connick,[2] the Court concluded that the "government's interest in the effective and efficient fulfillment of its responsibilities to the public" outweighed the plaintiff's first amendment protection. Even though the plaintiff's speech was constitutionally protected, she was a public employee speaking "not as a citizen" and on matters "only of personal interest." Id. at 150-54.
 
 
 20
 Connick broadens the restriction upon a public employee's communication particularly when criticizing aspects of employment. Generally, courts will not protect commentary respecting internal policies--work-site criticism. The Court's narrow scope of protected speech appears to "give greater scope to the legitimate rights of governmental entities as employers, and also to reduce the burdens on the courts caused by the burgeoning of litigation...." The majority in Connick "reacted to what it perceived to be a vertiable flood of personnel disputes that diverted an inordinate quantity of judicial resources."
 
 
 21
 Matheson, A Peacock's Tale: Due Process and Free Speech in Academe, 1986 Ariz.St.L.J. 401, 438-39 (footnotes omitted).
 
 
 22
 The Court in Connick provided little guidance in determining whether an issue is one of public or private concern. According to the Court, whether a particular communication addresses a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. Because this inquiry constitutes a question of law, the reviewing court must independently evaluate an employee's speech in each case.
 
 
 23
 Although the courts have experienced difficulty in applying the Connick, some agreement is developing. Courts tend to identify internal employment squabbles involving salary, course assignments, and teaching evaluations as matters of only private interest or as extensions of purely private disputes. See, e.g., Renfroe v. Kirkpatrick, 722 F.2d 714, 715 (11th Cir.1984); Ballard v. Blount, 581 F.Supp. 160 (N.D.Ga.1983), aff'd, 734 F.2d 1480 (11th Cir.1984). On the other hand, speech related to exposing waste, ineptitude, breach of public trust, or danger to the public in government, see Connick, 461 U.S. at 146-49; electorate issues to inform public debate, see Pickering, 391 U.S. at 568-72; and academic standards, see Johnson v. Lincoln University, 776 F.2d 443, 452 (3d Cir.1985), are matters of public concern.
 
 
 24
 The district court erroneously held that Ghosh's grievances warranted first amendment protection because they were akin to filing a lawsuit. Ghosh v. Ping, No. C-2-82-1356, slip op. at 14 (S.D.Ohio Aug. 26, 1987). The court should have focused on whether Ghosh's speech concerned a matter of public or private concern. Connick v. Myers, 461 U.S. 138 (1983). Ghosh's grievances were private: the controversy was in the setting of a private dispute, disruption in the Afro-American Studies Department was threatened, and there was a negative impact on a close working relationship (Ghosh and his department head were not on speaking terms after the events described above). Ghosh's grievances, moreover, concerned a teaching evaluation and a tenure/nonrenewal decision. Other courts have classified these matters as private concerns. See Renfroe, 722 F.2d at 715; Ballard, 581 F.Supp. at 164-65. Ghosh's grievances did not address any matter of public concern.
 
 III. LIBERTY INTEREST
 
 25
 The second issue addressed was whether Ghosh's liberty interest was violated. In Board of Regents v. Roth, 406 U.S. 564, 573-74 (1972), the Supreme Court stated that a person is deprived of a liberty interest when his reputation is stigmatized or when actions are taken that foreclose his opportunity to secure other employment. Later rulings, however, indicate that the Court has narrowed the scope of the liberty interest in procedural due process settings. For example, an assault upon another's reputation, without a more tangible alteration of legal status, such as the accompanying loss of employment, may not be sufficient to trigger constitutional protection. See Paul v. Davis, 424 U.S. 693, 711 (1976); see also Codd v. Velger, 429 U.S. 624 (1977) (holding that an employee has a right to a hearing only if the employer proceeds on the basis of substantially false allegations).
 
 
 26
 Wells v. Doland, 711 F.2d 670 (5th Cir.1983), provides an example of a liberty interest in reputation. Professor Wells sued the president of the university that refused him tenure and terminated his employment. Wells alleged that the reasons given for his termination attacked "his good name, reputation, and integrity so as to possibly deprive him of future state employment [and] caus[ed] damage to his professional reputation." Id. at 673. In reversing the district court's summary judgment for Wells' employer on the liberty issue, the Fifth Circuit held that Wells was entitled to an opportunity to prove certain elements of impairment: (1) That he was stigmatized; (2) that the stigma was part of the discharge process; (3) that the charges were made public; and (4) that he was denied a meaningful hearing to clear his name. Id. at 676. On remand, the district court was required to order the university to provide Wells with a hearing to clear his name, if these four elements of liberty impairment were established.
 
 
 27
 Assuming that the employee can demonstrate a liberty deprivation, he further must demonstrate that the deprivation occurred without due process of law. First, the employee is entitled to some type of pretermination hearing. Cleveland Board of Education v. Loudermill, 470 U.S. 532 (1985).[3] Although this hearing need not definitely resolve the propriety of the dismissal, it should permit a "determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Id. at 545-46. It must include oral or written notice of the charges against the employee, an explanation of the employer's evidence, and an opportunity for the employee to present his side of the story. Id.
 
 
 28
 Ghosh claimed that the letter written by Dean Borchert implicates a liberty interest. We disagree because the letter did not tend to stigmatize his reputation or foreclose opportunity to secure other employment. Although Ghosh experienced difficulty locating other employment, this was attributable to existing market conditions rather than the letter. Ghosh never demonstrated, moreover, that the letter was publicized or shown to anyone outside of the University.
 
 
 29
 It is doubtful that a liberty interest was involved, but if we assume that it was, Ghosh still received sufficient due process. At every stage of the administrative review, Ghosh was given notice and an opportunity to present his side of the story.
 
 IV. ATTORNEYS' FEES
 
 30
 Ohio University contends that it is entitled to attorneys' fees under 42 U.S.C. Sec. 1988 "upon a finding that [Ghosh's] action was frivolous, unreasonable or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978). We conclude that plaintiff's claims were not frivolous. Thus, the district court's refusal to award fees to Ohio University is AFFIRMED.
 
 
 
 [1]
 Rose also was asked to re-evaluate the ratings he gave to two other professors
 
 
 [2]
 The plaintiff in Connick was an assistant district attorney in New Orleans. Because she objected to a transfer to a different sector of the criminal court, she prepared a questionnaire and distributed it to her office colleagues. The questionnaire sought reactions to the office transfer policy, office morale, lack of confidence in supervisors, the need for a grievance committee, and possible pressure to work in political campaigns. Her supervisors immediately fired her when they learned of the questionnaire
 
 
 [3]
 Although Loudermill involved deprivation of a property interest, the same analysis should apply to deprivation of a liberty interest