Isaac E. DAVIS, III,
Plaintiff-Appellant,

v.

Wallace E. MANN, Etc., et al.,
Defendants-Appellees.

No. 88-4381.

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1989.

Michael B. Wallace, Jackson, Miss., for plaintiff-appellant.

Rickey T. Moore, Sp. Asst. Atty. Gen., Gail Lowery, Jackson, Miss., for defendants-appellees.

Before WISDOM, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Isaac E. Davis, III (Davis) appeals from the district court's grant of summary judgment in favor of defendants-appellees Wallace E. Mann, *et al.* Davis brought suit against the defendants for alleged violations of his First and Fourteenth Amendment rights in connection with his dismissal from the General Practice Residency Program of the University of Mississippi Dental School. Davis claimed that his dismissal was prompted in retaliation for exercise of his First Amendment rights and that the dismissal procedures violated his Fourteenth Amendment rights to procedural due process. The district court granted the defendants' motion for summary judgment on the Fourteenth Amendment claim and rendered that judgment final pursuant to Rule 54(b). The First Amendment claim is still pending in the district court.

**Facts and Proceedings Below**

Davis is a board-certified dentist who in 1985 entered the General Practice Residency Program (the GPR program) of the University of Mississippi (the University). He signed a contract with the University prior to the start of the GPR program. The contract was to run from July 1, 1985, until June 30, 1986.

The contract stated that Davis would receive remuneration of $17,500 for the contract year. Termination of the contract

could result from Davis' "malfeasance, inefficiency, or contumacious conduct." In addition, the contract stated that the University would provide an appropriate educational program for Davis and that Davis in return would "fulfill the educational requirements for the program." Upon completion of the program Davis would receive appropriate certification for "time satisfactorily completed."[1] Mississippi's GPR program operated like a typical medical residency. The residency year was divided into six clinical rotations, which the resident had to satisfactorily complete in order to obtain certification.[2]

Davis' first rotation was the University Hospital rotation, which lasted from July 1 until September 1, 1985, and from September 16 until September 30, 1985. His evaluation by that rotation's director, Dr. Manious, was excellent. From September 2 until September 15, 1985, Davis participated in the emergency room rotation. Davis received a highly favorable recommendation upon completion of that rotation. In October 1985 Davis participated in the anesthesiology rotation. Although the evaluation listed some concerns (Davis had not taken basic CPR or ACLS training), the overall evaluation stated that Davis was a "[g]ood man, satisfactory performance on our service."

At the end of October 1985, Davis began the family medicine rotation. At some point in late October, Davis and another

resident wrote a memo to the dean of the dental school, Wallace E. Mann (Mann),[3] concerning problems that they perceived existed in the GPR program. Dissatisfied with Mann's response to the memo, Davis sent the memo to the Mississippi Dental Association (the MDA). At that time the MDA was involved in an accreditation review of the University's GPR program and dental school.

Davis' performance problems surfaced in November 1985. The family practice rotation evaluation reveals Davis' lack of interest in family practice. However, it also states that Davis made an "honest effort." While the evaluation was not clearly positive, Davis did receive a satisfactory rating and the director wrote that he "enjoyed having [Davis]" there. In mid-November Davis started the GPR clinic rotation, which was under the direction of Dr. Hodgson. On November 20, 1985, Hodgson wrote a memo to Davis outlining the responsibilities and expectations of the GPR program. Among the expectations was "excellence in your dental charts with full documentation of pre-existing conditions."[4] The memo further stated that Davis' charts would be audited on a periodic basis. On December 5, 1985, Hodgson counseled Davis verbally on the expectations of the program. On December 7, 1985, Hodgson met with two other members of the faculty, Dr. Comer and Dr. Hanes, to discuss Davis' situation. Between January 20–25, 1986,

---

1. GPR certification is a necessary prerequisite to further specialized residencies that enable a dentist to become licensed and practice in a specialized area of dentistry such as oral surgery, periodontics, or endodontics.

2. The six rotations were the emergency room rotation, anesthesia rotation, family medicine rotation, V.A. rotation, University Hospital rotation, and the GPR Clinic rotation.

3. Davis did not send the memo to the head of the GPR program, Dr. Hodgson, but sent it directly to Dean Mann.

4. The memo also stated:
   "In just two days you have come back from lunch late; seen patients late; called and told auxiliary that you were tied up somewhere that you were not supposed to be anyway; asked that someone else take the responsibili-

ty to see your patient. This is *unacceptable behavior and your performance must improve and become more responsible and professional if you are to continue in your position as a General Practice Resident.* I expect you to treat your patient on a timely basis, working up your treatment plans and getting them into the program as quickly as possible using all the resources at the school for excellence in diagnosis and treatment. . . .
   " . . . .
   "Finally, I expect significant improvement in your performance in the next two weeks or further action will be taken. You can consider this as your second reprimand: one verbally two weeks ago and now this written one. A copy of this letter will be placed in your personnel file." (Emphasis added).

Hodgson audited Davis' thirty active patient charts. On February 5, 1986, Davis was given a memo from Hodgson and Comer. The memo stated that Davis had thirty days to improve his performance.[5]

Davis claims that between the date he received the memo, February 5, 1986, and the deadline date stated in the memo, February 13, 1986, he went to both Comer and Hodgson to ensure that his records were corrected and in conformity with the memo specifications. Hodgson apparently made notes on some charts that needed corrections and sent them back to Davis. Davis also stated that Hodgson attached a note to one of the records that indicated that Hodgson felt that the bulk of the records were ready for processing.[6] Beginning on February 17, 1986, Hodgson, Comer, and Hanes began an audit of all of Davis' charts to see if Davis had corrected the deficiencies in accordance with the February 5th memo.[7]

On February 10, 1986, the first private faculty committee meeting (meeting 1) was held to discuss Davis' performance. The full minutes of meeting 1 reveal that Hodgson reported Davis' progress as follows:

"1. *University Hospital Rotation*—he is performing surgery above his capabilities.

"2. *Anesthesia Rotation*—He did not complete the ACLS Course.

"3. *Emergency Room Rotation*—Rotation went well.

"4. *Family Medicine Rotation*—October through November

(a) He attended the rotation poorly.

(b) He skipped the first week during which he was seen over at Clinic # 8.

" . . . .

"(d) Dr. Davis did give a lecture to the residents at the Family Medicine Clinic which was received very well.

(e) Dr. Davis received a less than adequate evaluation from Dr. Robert Forbes."

Hodgson also reviewed memos in Davis's file and detailed specific instances of Davis's poor performance on the GPR clinic rotation.[8] Hodgson concluded that he could not give Davis a positive evaluation on the GPR clinic rotation.

On March 20, 1986, the second private faculty committee meeting (meeting 2) was held to discuss Davis's performance.[9] Hodgson went through a representative number of Davis's charts and pointed out their deficiencies. After one-and-a-half hours of discussion, the committee unanimously agreed that Davis's academic performance was unsatisfactory and that he

5. The memo said that Davis was to accomplish the following remedial actions by February 13, 1986: "a pretermination charting showing existing conditions; a complete treatment plan generated, ... and a computerized treatment plan generated. The computerized plan was to be signed by patient and Davis and dated. All treatment already completed was to be dated in the proper area and turned in to the record room so billing ... could be accomplished."

6. The undated note reads as follows:
"Sandy,
"This list of patients were all your active patients.
Not all have deficiencies—
"These records seem to be ready for processing except Spencer, Gitanta—needs more dates filled in on treatment given.
"We need to talk sometime today about follow up necessary on Mary Ann Haralson.
"/s/ M. Hodgson"

7. A copy of the undated note quoted in footnote 6, *supra,* was submitted to the hearing committee. Hodgson testified at the May 8, 1986 hearing that Davis had asked him specific questions about specific charts, which Hodgson answered; but Hodgson asserted that Davis did not ask for and Hodgson did not perform a general review of the charts prior to the February 17th audit.

8. Hodgson stated that his concerns about Davis' conduct were as follows:
"1. Stated that he is not that concerned about the charts—they can be straightened out.
"2. Stated that his concern is if Dr. Davis knows why he needs to keep good records and
"3. If he knows the relation between good record keeping and good patient care.
"4. Concern of abandonment and lawsuits."

9. Eight of the ten members present had also been in attendance at meeting 1 on February 10, 1986. A memorandum from Hodgson to Mann, dated March 21, 1986, summarized the results of meeting 2.

should not receive certification. By a vote of 6–3, the committee recommended that Davis be dismissed from the GPR program immediately.

On April 2, 1986, Comer and Mann met with Davis and gave Davis a letter dated April 1, 1986, which notified Davis that he would be dismissed from the GPR program as of April 30, 1986. The letter stated that Davis was being dismissed for academic reasons and that he would be afforded an ad hoc committee hearing if he so requested. Davis requested a hearing, and on April 30, 1986, a letter was sent to Davis informing him that the hearing would be held on May 8, 1986. The letter also listed the witnesses that would appear on behalf of the University and included a detailed summary of what the witnesses' testimony would entail.[10]

The hearing convened on May 8, 1986. Five members of the dental and medical professions—so far as the record shows, all well respected and qualified—served as committee members.[11] Davis had counsel present. The committee heard several witnesses' testimony, including that of Hodgson, Comer, Manious, and Davis. The transcript of these proceedings runs some 229 pages. In addition, the committee was given copies of notes summarizing Hodgson's and Comer's testimony, several memoranda, correspondence, the GPR program residents' manual, Davis' rotation evaluations, and a copy of the letter that Davis had sent to the MDA critiquing the GPR program. The committee was also given a truncated version[12] of the minutes of meeting 1 held on February 10, 1986, and a copy of the memo from Hodgson to Mann summarizing the results of meeting 2 held on March 30,

10. The April 30th letter stated in pertinent part:
"The subject matter of the scheduled hearing will be as follows:
"1. That during the course of your attendance in the General Practice Residency program your general activities clearly demonstrated unsatisfactory academic performance.... The major violation of academic directives ... are as follows: .... You were instructed in a prior memo to perform no definitive treatment [on a certain patient, Ms. H.B. Chickering] without a treatment plan. No treatment plan had been prepared for, presented to or approved by Ms. Chickering....
".... Ms. Catherine Vaughn, a dental assistant ... informed Doctors Hodgson and Comer that you had talked to her twice about the patient Chickering visit. You asked her to corroborate a story that you had neither administered the anesthetic nor restored the teeth. She stated that she refused to cover up your failure to record proper medical and financial information.
"As a result of the preceeding events and after a review of several patient charts by the teaching committee, it was determined that your performance was academically deficient. Those deficiencies include inadequate evaluation of the patients' presenting conditions; omission of treatment plans; failure to record proper health histories; failure to record soft tissue examinations; failure to record periodontal assessments; and failure to initiate charges for services rendered."
The letter went on to state that Hodgson would "present a chronological history of your academic performance ... including evidence of the repeated consultations given you.... Hodgson will also testify as to his knowledge of the Haralson case where, as a result of

your treatment and poor judgment, the patient was forced to endure a prolonged surgical procedure thus placing the patient under greater risk."
The letter also stated that
"Dr. Comer will testify as to having counselled you on your academic deficiencies; he will explain and substantiate the existence of your academic performance. Dr. Comer will also present evidence of his review of your charts and his conclusions of your poor performance in the clinical area of the General Practice Residency Program."

11. Dr. Harold Grupe chaired the hearing. He was the chairman of the department of periodontics at the University of Mississippi. Dr. James Fitchie taught in the University's department of restored dentistry. Dr. Scott Gatewood was a teacher in the department of endodontics. Dr. Lessa Phillips was a physician who taught in the department of family medicine. Dr. Dan Quon practiced in oral surgery and was a part-time teacher in the department of oral and maxillofacial surgery.

12. The truncated "minutes" stated in pertinent part as follows:
"The meeting was called to order by Dr. Marlin Hodgson. The purpose of the meeting was to review the progress of Dr. Sandy Davis in the General Practice Residency.
"Dr. Davis's activities and evaluations for each rotation were discussed. Dr. Hodgson reviewed correspondence and summarized counseling sessions conducted with Dr. Davis. Frank and open discussions followed. The consensus of those attending was that Dr. Davis's performance had been academically unacceptable in some instances."

1986.[13]

By letter dated May 15, 1986, the hearing committee recommended to Mann that Davis be dismissed from the GPR program for "academically deficient dental practice performance while a student." The letter also stated that "since the performance of Dr. Davis the student was the same as Dr. Davis the employee, the School of Dentistry would have reasonable grounds to discontinue his employment." After listening to a tape of the hearing process and reviewing all the documentation submitted to the hearing committee, Mann reaffirmed his decision to dismiss Davis and informed Davis thereof by letter dated May 19, 1986. Davis requested a review of the termination decision by the Chancellor of the University. On July 17, 1986, the Chancellor affirmed the decision to terminate.

It is undisputed that Davis received the entire amount of compensation provided for in his contract. It is also undisputed that Davis did not have knowledge of the full version of the meeting 1 minutes at the time of the hearing in May 1986. Davis only learned of the longer version after discovery was conducted in this suit.

■ On October 16, 1986, Davis filed this action against Mann and the Board of Trustees. Davis alleged several state and federal law claims, but the only one relevant to this appeal is his procedural due process claim.[14] Davis filed a motion for

partial summary judgment and the defendants filed for summary judgment on all claims. The district court denied all the motions. The district court then reconsidered its decision and granted the defendants' motion for summary judgment on the due process claim on September 23, 1987. Following motions by both sides that related to state law issues, the district court withdrew its original opinion. The district court rendered another opinion on March 24, 1988, which was substantially identical to the earlier opinion on the due process claim. That opinion was rendered final pursuant to Rule 54(b). Davis brings this appeal.[15]

## Discussion

In evaluating Davis' procedural due process claims, we must decide (1) whether Davis had a property interest in his continued employment and in his continued status as a resident in the GPR program, (2) what process was due Davis before he could be deprived of any constitutionally protected property interest, and (3) whether the University accorded Davis the process due. *See, e.g., Page v. DeLaune,* 837 F.2d 233, 238 (5th Cir.1988); *Brown v. Texas A & M University,* 804 F.2d 327, 333 (5th Cir.1986).

■ The contract between Davis and the University stated that Davis would be dismissed from employment only for "malfea-

---

**13.** The committee was unable to hear all the testimony on May 8, 1986, so the hearing was reconvened and concluded on May 15, 1986.

**14.** Davis' First Amendment based claims (his Count II) remain pending in the district court. The district court issued a memorandum opinion on March 24, 1988, denying Davis's motion for partial summary judgment and granting the defendants' motion for summary judgment on the due process claim. The district court also dismissed all of the state law claims, but declined to dismiss Count II, which alleged that the state had denied Davis his First Amendment and Fourteenth Amendment rights by dismissing Davis in retaliation for his communications criticizing the GPR program. By motion of April 5, 1988, Davis asked the district court to enter final judgment, pursuant to Federal Rule of Civil Procedure 54(b), on all counts finally adjudicated by the court and for a stay on further proceedings on Count II pending appeal

to this Court. The court granted the motion by order of May 3, 1988, and judgment was entered the same day in favor of defendants on Counts I, III, IV, and V of the second amended complaint. The defendants did not object to the Rule 54(b) determination.

**15.** A question arises as to whether this Court has jurisdiction to hear this case. Pursuant to Rule 54(b), in order for there to be a final appealable judgment, there must be more than one claim for relief. *See* Wright and Miller, *Federal Practice and Procedure,* § 2656 at 50 (2d ed. 1983). The district court disposed of all claims founded on a deprivation of procedural due process and issued an appropriate Rule 54(b) certification. We hold that the Count II claims (which remain pending below) were sufficiently distinct from the procedural due process claims to allow this Rule 54(b) treatment. *Henderson v. Sotelo,* 761 F.2d 1093, 1095 (5th Cir.1985).

sance, inefficiency or contumacious conduct." Such language generally suffices to create a protected property right. *See, e.g., Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1491–92, 84 L.Ed.2d 494 (1985); *DeLaune,* 837 F.2d at 238–39; *Schaper v. City of Huntsville,* 813 F.2d 709, 713–14 (5th Cir.1985). However, we need not inquire what process was due or whether that process was afforded Davis prior to his termination from employment, because it is undisputed that Davis received his full salary under his employment contract. We have found that an employee suffers no compensable damage from an early employment termination where he has been paid his full salary for the contract year. *See, e.g., Robinson v. Boyer,* 825 F.2d 64, 67 (5th Cir.1987); *Jett v. Dallas Indep. School Dist.,* 798 F.2d 748, 753–54, *reh'g denied,* 837 F.2d 1244 (5th Cir.1988), *aff'd in part, vacated in part and remanded on other grounds,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Clearly, with his full stipend paid and his dental degree intact, Davis's employment termination did not deprive him of his "means of livelihood." *Loudermill,* 105 S.Ct. at 1494.

■ We also find no support in the case law for Davis's claim that he is entitled to the duties and responsibilities of his employment as specified under the contract. *See, e.g., Robinson,* 825 F.2d at 67 (stating plaintiff was fully compensated when he received his full salary for the contract year); *Jett,* 798 F.2d at 754 (finding that oral contract did not "create a property interest in the intangible, noneconomic benefits of [plaintiff's] assignment as coach"). While there is some authority for the proposition that an employee may have a protected property interest in noneconomic benefits of his work, there is no authority for such a claim where the noneconomic benefits are identical to the academic performance required of the resident employee under the same contract.[16]

The contract provided that "[the University] will provide an educational program for postgraduate ... training in keeping with established standards." The contract further stated that Davis agreed to "fulfill the educational requirements for the program," and to "comply with ... all laws, regulations and policies governing [the Medical Center]." In addition, the contract stated that Davis would "consider the stated stipend and the experience and instruction received as sole compensation from [the] University." Davis asserts that such language specifically creates a protected property interest in the "experience and instruction" he was to receive in the GPR program.

■ Like the Supreme Court in *Board of Curators of Missouri v. Horowitz,* we need not decide what type of interest Davis had in the GPR program, because even "assuming the existence of a liberty or property interest," Davis received all the process he was entitled to under the Fourteenth Amendment in respect to his interest in the GPR program. 435 U.S. 78, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978). Courts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs.[17] *Id.; see also Goss v. Lopez,* 419 U.S. 565, 95 S.Ct.

---

16. We have stated that unless the state "specifically creates a property interest in a noneconomic benefit—such as a particular work assignment—a property interest in employment generally does not create due process property protection for such benefits." *Jett,* 798 F.2d at 754 n. 3; *Findeisen v. North East Indep. School Dist.,* 749 F.2d 234, 240–41 & n. 3 (5th Cir.1984) (Garwood, J., concurring), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985). None of these cases involved a paid student or resident situation, nor did the case that the appellant relies on in his brief. *See Cantrell v. Vickers,* 495 F.Supp. 195 (N.D.Miss.1980) (in-

volving a school teacher's right to continue teaching).

17. We have held that in employment termination cases, the minimum pretermination procedural protections required by the Fourteenth Amendment are (1) written notice of the reasons for termination and (2) an effective opportunity to rebut those reasons. *See, e.g., Russell v. Harrison,* 736 F.2d 283 (5th Cir.1984); *Thurston v. Dekle,* 531 F.2d 1264, 1273 (5th Cir.1976), *vacated and remanded on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1987). In *Harrison* we stated that an "effective rebuttal

729, 740, 42 L.Ed.2d 725 (1975); *Mahavong-sanan v. Hall*, 529 F.2d 448, 449–50 (5th Cir.1976) ("We know of no case which holds that colleges and universities are subject to the supervision or review of the courts in the uniform application of their academic standards.") (quoting *Wright v. Texas Southern University*, 392 F.2d 728, 729 (5th Cir.1968)).

In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975), the Supreme Court held that a student who was dismissed for disciplinary reasons was entitled to "oral and written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." However, in *Horowitz*, 98 S.Ct. at 953, where a medical student was dismissed from medical school for inadequate performance in her clinical rotations, the Supreme Court stated that "far less stringent procedural requirements" are necessary in the case of an academic dismissal. The Court concluded that "considering all relevant factors, including the evaluative nature of the inquiry and the significant and historically supported interest of the school in preserving its present framework for academic evaluations, a hearing is not required by the Due Process Clause of the Fourteenth Amendment," even though the dismissal from medical school was a more severe deprivation than the ten-day suspension in *Goss*. *Id.* at 953 n. 3 (discussing requirements of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). Davis' education and employment were inseparable; therefore, Davis argues that his dismissal from the residency program, which is by necessity also his dismissal from employment, should be accorded full procedural protections, rather than the minimal protections required for an academic dismissal. But Davis's approach allows the tail to wag the dog.

The residency program is distinct from other types of employment in that the resident's "work" is what is academically supervised and evaluated. It is well-known that the primary purpose of a residency program is not employment or a stipend, but the academic training and the academic certification for successful completion of the program. The certificate, like the diploma, tells the world that the resident has successfully completed a course of training and is qualified to pursue further specialized training or to practice in specified areas. The fact that the contract stated that an academic program would be provided and that Davis agreed to satisfy the requirements of the program states nothing more than any other student-university enrollment agreement. The fact that the contract stated that the GPR instruction was part of Davis' compensation does not alter the GPR program's academic nature.

The same factors that justified minimal procedural protections in the *Horowitz* medical school context apply with equal force to the paid residency situation. *See Horowitz*, 98 S.Ct. at 954–55. Successful completion of the residency program depends upon subjective evaluations by trained faculty members into areas of expertise that courts are poorly equipped to undertake in the first instance or to review. *Id.* at 954. "A school is an academic institution not a courtroom or administrative hearing room," and thus it should not be weighted down with formalized procedural requirements imposed by actors estranged from the academic environment. *Id.* at 954; *see also Regents of University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985); *Levi v. University of Texas at San Antonio*, 840 F.2d 277, 280 (5th Cir.1988). The fact that Davis received a stipend for his clinical training in addition to the opportunity to successfully complete the GPR program does not alter the fact that he was participating in an academic program in order to receive academic certification. For the foregoing reasons, we decline to apply the full procedural protections of the Fourteenth Amendment to Davis' academic dismissal.

This, of course, does not mean that Davis was not entitled to some procedural safe-

---

means that the employee is given 'the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.'" *Harrison*, 736 F.2d at 289 (quoting *Dekle*, 531 F.2d at 1273).

guards under the Fourteenth Amendment. Certainly Davis must be given some meaningful notice and an opportunity to respond. *See Mathews v. Eldridge,* 96 S.Ct. at 902; *cf. Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077, 1080 (5th Cir.1984) (case involving suspension from school). Here it is clear that Davis received even more procedural protections than are required by the Fourteenth Amendment in an academic dismissal context. Starting in November 1985, Davis received frequent and detailed notice of his academic problems and potential dismissal. On April 2, 1986, he met with Mann and Comer, who at that time handed him the letter of dismissal effective April 30, 1986. Davis was given the right to a hearing and obtained that hearing before an impartial, five-member committee. A week before the hearing, Davis was given a detailed summary of the charges and witnesses against him. He had access to the materials that would be utilized against him, including the charts that Comer critiqued before the committee. He had counsel present at the hearing and Davis was allowed to cross-examine the adverse witnesses as well as present his version of events. In addition, Davis was allowed to appeal the decisions of the committee and the Dean to the Chancellor.

To establish a denial of procedural due process, Davis must show substantial prejudice. *Keough,* 748 F.2d at 1083; *U.S. Pipe & Foundry v. Webb,* 595 F.2d 264, 274 (5th Cir.1979). Davis claims that he was prejudiced by the denial of a pretermination hearing and a hearing before the official charged with the authority to dismiss him. However, pursuant to *Horowitz,* Davis was not entitled to any hearing—much less the full-blown posttermination hearing he received. *See Horowitz,* 98 S.Ct. at 953. Davis also asserts that he was denied adequate notice of the charges against him. However, the letter of April 30, 1986, provided ample notice of the charges, and several of the earlier memoranda clearly notified Davis that if he did not significantly improve his academic performance serious consequences would result.[18]

18. See footnotes 4 & 10, *supra.*

■ Finally, Davis claims that the University relied upon falsified evidence and breached its agreement to provide Davis with relevant documentary evidence. It is undisputed that a copy of the full minutes from meeting 1 held in February 1986 was not given to the hearing committee in May 1986, nor did Davis see a copy of the full meeting 1 minutes until the cross motions for summary judgment in the district court below. Davis and the hearing committee were given a truncated version of the meeting 1 minutes, and the University offered no explanation for why neither Davis nor the committee received the full minutes.

Davis claims that the truncated minutes were misleading and omitted information favorable to Davis' position. When one compares the truncated version to the full version, it is clear that the truncated version is incomplete rather than false. Davis correctly asserts that the full minutes contained comments favorable to Davis, while the truncated minutes did not reflect such positive comments. However, the great bulk of the favorable comments made at the February meeting but missing from its truncated minutes were those made by Dr. Manious, and Dr. Manious testified at the May hearing for Davis in fuller and more favorable terms than the full February minutes provided. Thus, any *Brady*-type claim that Davis attempts to raise in this academic proceedings context could not survive even if we were to recognize such a claim, and we do not. *See, e.g., Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Moreover, it is not disputed that the same faculty committee at its March 1986 meeting (meeting 2) did recommend Davis's termination by a 6–3 vote and the May hearing committee was accurately so informed.

Of somewhat more concern is the fact that the full February minutes indicate that at the February meeting Dr. Hodgson was apparently presenting to the faculty committee selected specific negative points from Davis' rotation evaluations and not mentioning the overall highly favorable recommendations in those evaluations. It

is unclear whether the faculty committee members had access to the evaluations during their meeting 1 in February 1986, or in their meeting 2 in March 1986 when they voted 6–3 to dismiss Davis (or in the interim between the February and March meetings). While this mode of presentation may have prejudiced the faculty committee, it was not the faculty committee of February and March 1986 that ultimately decided Davis's fate, but Dean Mann, after consideration of the May 1986 hearing committee's independent decision.

Regardless of what Hodgson said to the members of the faculty committee in February 1986, it is clear that the hearing committee in May 1986 evaluated the evidence independent of prior decisions and reached their own conclusion regarding Davis' academic performance.[19] It is undisputed that the committee had before it the positive evidence of Davis' rotation evaluations, Dr. Manious' testimony, several other witnesses' favorable testimony, Davis' testimony, and Davis' letters to Mann and the MDA on the problems with the GPR program. The committee also had the negative testimony of Hodgson and Comer, the negative evaluation by Hodgson, and admissions of poor judgment and performance by Davis. It was the committee's task to sift through the evidence and come to a decision. Davis was represented by counsel. Although the full version of the February minutes may have aided Davis in preparing or presenting his case, and in cross-examining Hodgson, the hearing provided here is not evaluated under the strict procedural standards accorded criminal trials, nor for that matter is it evaluated under the procedural standards enforced in civil court trials or hearings. Though we are disturbed by the fact that the full minutes were not presented to the faculty committee in February (or March) nor available to Davis at or prior to the May hearing, we do not find such an omis-

sion sufficiently egregious and prejudicial to amount to a denial of the very limited process constitutionally due Davis. As indicated above, Davis had ample opportunity at the hearing through positive witnesses and documentation, as well as through cross-examination, to effectively present his case.

The decision of the district court is accordingly

AFFIRMED.

---

**19.** In their letter to Mann dated May 15, 1986, the committee stated as follows:

"As the tapes and transcripts of the hearing will show, each side had a full opportunity to present its facts for the committee's consideration....

"As the committee understood its task, it was to consider all the evidence and make its

own, independent judgment—and this it did. After due deliberations of everything presented, the committee, meeting in closed session, voted by secret ballot to recommend that Dr. Davis be dismissed from the GPR program...."