**Lee Edward BROWN, Appellant,**

v.

**The UNIVERSITY OF TEXAS HEALTH CENTER AT TYLER, Richard Kronenberg, M.D., Richard Viken, M.D., and Pieter DeWet, M.D., Appellees.**

**No. 12–97–00123–CV.**

Court of Appeals of Texas, Tyler.

Nov. 26, 1997.

---

Lance S. Baxter, Plano, for appellant.

Dedra Lynn Wilburn, Austin, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HADDEN, Justice.

Dr. Lee Edward Brown ("Brown") brought suit against The University of Texas Health Center at Tyler ("UTHCT") and three officials of UTHCT, individually, asserting that he was wrongfully terminated from his residency in its family practice program. Brown alleged causes of action based on breach of contract, tortious interference with prospective business relations, denial of procedural and substantive due process, and denial of freedom of speech. He sought damages, re-

instatement into the program, and injunctive relief. The defendants filed a motion for summary judgment which was granted by the trial court. On appeal, Brown, in one point of error, alleges that the trial court erred in granting the summary judgment. We will affirm.

## STANDARD OF REVIEW

The standard of review on appeal is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that a judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex. 1985); *Cortez v. Liberty Mut. Fire Ins. Co.,* 885 S.W.2d 466, 469 (Tex.App.—El Paso 1994, writ denied). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. Tex.R. Civ. P. 166a; *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex. 1970).

## BREACH OF CONTRACT AND TORTIOUS INTERFERENCE

■ Brown alleged that UTHCT breached its contract with him by terminating his residency prior to the conclusion of his annual contract. In its summary judgment motion, UTHCT asserted that it was a state agency and that the three individual defendants, as employees of a state agency, were acting within the course and scope of their employment. UTHCT argues that Brown's suit is, therefore, a suit against the State of Texas and, as such, is barred by the doctrine of sovereign immunity. We agree.

■ The State as sovereign is immune from suit without consent even though there may be no dispute regarding the state's liability. *Missouri Pacific R.R. Co. v. Brownsville Nav. Dist.,* 453 S.W.2d 812, 813 (Tex.

1970). The doctrine bars a suit against the State unless the State has expressly given its consent to be sued; *Id.* at 813; *see also* Tex. Civ. Prac. & Rem.Code Ann. §§ 101.025, 107.001–.005 (Vernon Supp.1996). A party suing a governmental entity protected by sovereign immunity must allege consent to suit either by reference to a statute or express legislative permission. *Missouri Pacific R.R. Co.,* 453 S.W.2d at 814. Unless there is a pleading of consent, the trial court has no jurisdiction to hear the case. *Id.*

■ Brown argues that an exception to this doctrine exists, in that the state waives its immunity from liability when it contracts. In support of this proposition, he cites *Dillard v. Austin Indep. School Dist.,* 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied) and *Ntreh v. University of Tex. at Dallas,* 936 S.W.2d 649 (Tex.App.—Dallas 1996). There has been a conflict among the courts of appeals on whether the State, by entering into a contract with a private citizen, waives *immunity from suit* by the mere fact that it has made the contract, rendering legislative consent to sue unnecessary. However, the Supreme Court has recently handed down its decision in *Federal Sign v. Texas Southern Univ.,* 951 S.W.2d 401(Tex.1997) and addressed this conflict. The Supreme Court, after analyzing the conflicting holdings among the courts of appeals, and citing *Missouri Pacific R.R. Co.,* specifically held that "a private citizen must have legislative consent to sue the state on a breach of contract claim. The act of contracting does not waive the State's *immunity from suit."* Accordingly, the Court expressly overruled any cases that hold to the contrary. *Federal Sign,* 951 S.W.2d at 408. Thus, the contrary holdings in *Dillard* and *Ntreh* have been expressly overruled. See *Ntreh,* 947 S.W.2d 202 (Tex.1997)(writ granted, judgment modified.)

In the instant case, Brown did not allege a valid statute or an express legislative permission to sue the State for breach of contract or tortious interference with prospective business relationships.[1] Moreover, the summary

1. Brown erroneously alleged that section 76.04 of the Texas Education Code granted him consent to sue. However, that section is solely applicable to the University of Texas at Tyler which is an entity separate and apart from UTHCT. Section 74.601 of the Texas Education Code governs UTHCT. There is absent from that section any language granting consent to sue UTHCT.

judgment evidence shows that he had not obtained such consent. Thus, the trial court was correct in granting UTHCT a summary judgment on Brown's claims based on breach of contract and tortious interference with prospective business relations.

## *PROCEDURAL DUE PROCESS*

 Recognizing that a state agency cannot be liable for constitutional torts because it is not a "person" capable of violating an individual's rights pursuant to 42 U.S.C. § 1983 (1988),[2] Brown limited his constitutional claims to the three individually named defendants, Richard Kronenberg, M.D., Richard Viken, M.D., and Pieter DeWet, M.D. (sometimes referred to collectively as the "individual defendants"). Viken was Chairman of The Department of Family Practice and Director of the Family Practice Residency Program for UTHCT. Viken monitored Brown's behavior, placed him on administrative leave status and ultimately wrote the letter of dismissal to Brown. It is not clear from the record what official capacities DeWet and Kronenberg held at UTHCT, but factual allegations by Brown indicate that they assisted Viken in the residency program and participated in the supervision and discipline of Brown. Brown alleged that as a contract medical resident with the UTHCT, he had a liberty and a property interest which was denied him without due process of law in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the UNITED STATES CONSTITUTION. He claimed that he did not receive adequate notice of the reason for his discharge nor a meaningful opportunity to be heard. The individual defendants asserted that assuming, *arguendo*, that Brown had a liberty and property interest as a medical student under an employment contract, he received all of the procedural due process to which he was entitled. We agree.

 It is axiomatic that due process requires notice and an opportunity to be heard. *Board of Curators of University Missouri v. Horowitz*, 435 U.S. 78, 85, 98 S.Ct. 948, 952, 55 L.Ed.2d 124 (1978); *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). However, in *Horowitz*, where a student was dismissed from medical school, the Supreme Court stated that "far less stringent procedural requirements" are necessary in the case of an academic dismissal. *Horowitz*, 435 U.S. at 86, 98 S.Ct. at 953. Courts overwhelmingly agree that students, whether dismissed for academic or disciplinary reasons, are not entitled to as much procedural protection under the Fourteenth Amendment as employees who are terminated from their jobs. *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir.1989)(plaintiff dismissed from General Practice Residency of the University of Mississippi Dental Medical School).

The summary judgment evidence shows that on December 12, 1994, Brown was dismissed from the program by letter outlining in detail the reasons for his dismissal. The letter of dismissal stated that if Brown wished to appeal, he could do so by following the written appeal procedure, a copy of which was attached to the letter. On January 3, 1995, Brown gave notice that he wanted to appeal the dismissal. By letter dated January 20, 1995, postmarked January 23, 1995, Brown was notified that the appeal hearing was set for February 13, 1995. Brown did not appear at the hearing and the panel affirmed his dismissal.

 Brown's summary judgment evidence did not contradict the notice of charges made against him nor the notice of hearing. He admitted to such notices, but argued that he should have been given notice and a hearing *before* his dismissal. As in *Horowitz*, however, Brown is not entitled to as much procedural protection as employees who are fired. Relying on *Horowitz*, the court in *Davis* held that the dental resident received due process when the student, as did Brown in this case, received a dismissal letter prior to appealing his dismissal. *Davis*, 882 F.2d at 975. Brown further argued that due process was denied because: 1) he had only seven days' notice of the hearing as a result of delays in mail delivery; and 2) his request to postpone so as to give him adequate time to prepare was denied. The summary judgment evidence shows that the request was denied because other physicians with pa-

2. *Will v. Michigan*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989); *Laxey v.* *Louisiana Bd. of Trustees*, 22 F.3d 621, 623 n. 2 (5th Cir.1994).

tients and obligations were involved in the hearing. Furthermore, Brown admitted that he received the notice of the hearing January 30, 1995, fourteen days before the hearing. There is no constitutional requirement that an appeal hearing be held on a certain date or on a date more convenient for the Appellant. *Nash v. Auburn Univ.,* 812 F.2d 655, 662 (11th Cir.1987).

■ The individual defendants also assert that Brown waived his right to complain of a violation of procedural due process because he failed to attend the hearing and to avail himself of the opportunity to be heard. We agree. Brown was informed of the date of the hearing but failed to attend. By failing to appear for the hearing on February 13, 1995, Brown's opportunity to be heard was lost by his own inaction. *Stewart v. Bailey,* 556 F.2d 281, 285–86 (5th Cir.1977). Thus, under the authorities cited above, we hold that Brown's constitutional rights to procedural due process were not violated.

### SUBSTANTIVE DUE PROCESS

Brown alleged that in dismissing him from the residency program, the individual defendants acted in an arbitrary and capricious manner, that the decision to dismiss him was a departure from accepted academic norms, and that such actions were a violation of his substantive due process rights. The individual defendants, in their summary judgment motion, alleged that their decision to dismiss Brown was rational, deliberate, and based upon Brown's own behavior.

■ Substantive due process challenges strike at the decision itself and not at the procedures afforded the student in the academic decision-making process. *Alanis v. University of Tex.,* 843 S.W.2d 779, 788 (Tex. App.—Houston [1st Dist.] 1992). The Supreme Court has articulated the standard against which substantive due process claims in academic settings are to be analyzed. *Regents of the University of Mich. v. Ewing,* 474 U.S. 214, 219, 106 S.Ct. 507, 510, 88 L.Ed.2d 523 (1985). In 1989, that standard was adopted by the Houston Court of Appeals in *Eiland v. Wolf,* 764 S.W.2d 827, 835 (Tex.App.—Houston [1st Dist.] 1989, writ denied), and we adopt that standard here. In *Ewing,* the court determined that it was not

in a position to substitute its judgment for that of a faculty committee, which "was uniquely positioned to observe [appellant's] judgment, self-discipline, and ability to handle stress, and was thus especially well suited to make the necessary subjective judgment of his prospects for success in the medical profession." *Ewing,* 474 U.S. at 227, 106 S.Ct. at 514, 88 L.Ed.2d 523; *Alanis,* 843 S.W.2d at 789.

■ Since the *Ewing* decision, when a court evaluates a substantive due process claim based upon allegedly arbitrary action, it may not override the faculty's professional judgment in academic matters unless "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Eiland,* 764 S.W.2d at 835 (citing *Ewing,* 474 U.S. at 225, 106 S.Ct. at 513, 88 L.Ed.2d 523). The appellate courts have thus "independently reviewed the record for minimum professional judgment evidence; once found, such evidence was considered sufficient to justify judgment against the student as a matter of law." *Eiland,* 764 S.W.2d at 835; *Levi v. University of Texas at San Antonio,* 840 F.2d 277, 280 (5th Cir.1988 *Alanis,* 843 S.W.2d at 789); *Tobias v. University of Tex.,* 824 S.W.2d 201, 210 (Tex.App.—Fort Worth 1991, writ denied).

■ In their summary judgment motion, the individual defendants alleged that Brown was dismissed because of months of disruptive behavior and actions that revealed a distinct lack of professional and academic judgment. The summary judgment evidence shows the following incidents as forming the basis for Brown's dismissal:

> Throughout his final 13 months at UTHCT, Brown spent a great deal of his time complaining about an event that occurred on November 4, 1993, in the cafeteria at UTCHT. On that day, the father of Brown's girlfriend, Dale Geddie, had a conversation with Brown in which hostile language was exchanged. Brown admits that Dale Geddie never touched him. However, after the exchange between the two men, Brown began contacting various local, state, and federal authorities claiming that

Dale Geddie had assaulted him. For example, Brown contacted the F.B.I., Department of Public Safety, Texas Rangers, the Sheriff's Office, the ACLU, the Attorney General, the Chancellor and Board of Regents for the University of Texas. Brown wanted these authorities to investigate Dale Geddie and force him to answer to a judge or jury. When these authorities did not take the action against Dale Geddie that Brown wanted, Brown made threats against them. For example, he told the Sheriff that he would go to the media if the Sheriff ignored Brown's allegations. He promised the Chief of Police, John Moore, and the chief business officer, David Thurman, that he would subpoena them and have them "answer to a jury" if they "covered up these events."

Brown continued in his single-minded pursuit against his girlfriend's father for more than a year. On June 28, 1994, Brown was informed by the Director of UTHCT that he needed to focus his energies on his job as a physician and allow other officials within UTHCT to handle Human Resources issues.

In March of 1994, Brown was placed on probation for visiting the home of a person who was a client of Defendant UTHCT, but was not Brown's patient. The purpose of the visit was not to render medical assistance, but rather to vindicate Brown's girlfriend, another employee of UTHCT, who was being disciplined for discussing confidential information in the presence of the client. During this inappropriate visit, Brown wore his doctor's uniform and was recognized as a doctor and therefore a representative of UTHCT.

In August of 1994, Brown was placed on administrative leave for ten days after his girlfriend appeared at the emergency room for treatment and accused Brown of assaulting her. Dr. Brown was arrested and charged with assault.

On September 2, 1994, Brown failed to attend a meeting with his supervisors in which he was expected to explain conduct that was perceived as unsuitable to his position. Despite Brown's failure to attend the meeting Defendants gave Brown one week to explain reasons for his behavior in writing. Again, Brown failed to respond, and was therefore dismissed on September 9, 1994. As a result of internal mediation, Brown was then reinstated, contingent upon a full release from an evaluating psychiatrist/psychologist and Brown's agreement to remain in counseling for the duration of his residency.

On November 4, 1994, Brown again engaged in disruptive, inappropriate behavior on two occasions—once in the presence of a patient and once while fellow residents were taking an exam. As fellow employees allegedly "flocked" to Brown, Brown stated that he had "kicked [Executive Associate Director] Kronenberg's ass;" that "Kronenberg crept out of the room like the yellow-belly dog that he is;" and that Brown had "preached to the other prisoners while he lay on the floor in prison." In addition to other unprofessional behavior, Brown resisted taking calls on December 1 and 5, 1994. Brown indicated his desire to appeal his dismissal. In a letter postmarked January 23, 1995, Brown was informed that a hearing would be held on February 13, 1995. The hearing was held as scheduled, but Brown failed to appear. Brown asked that the hearing be postponed, but due to the difficulty in finding a time that was convenient for all the physicians on the hearing panel, as well as the witnesses, Brown's request was denied. His dismissal was upheld.

In his summary judgment affidavit, Brown did not directly controvert the above grounds for dismissal but simply explained his behavior from his own viewpoint. Using the standards outlined in *Ewing*, we conclude that the summary judgment evidence establishes, as a matter of law, that the defendants exercised their professional judgment and did not act in an arbitrary and capricious manner in dismissing Brown from the medical residency program. We are not to substitute our judgment for that of the faculty panel. Thus, we hold that Brown's constitutional rights to substantive due process were not violated.

## FREE SPEECH

■ Brown claimed that he was dismissed from the residency program in retaliation for exercising his First Amendment

right to free speech. He alleged that he was dismissed because of his verbal and written expression of concern about violence in the workplace at UTHCT. He had expressed this concern to officials at UTHCT and when no action was taken, he complained to local, state, and federal authorities. He contended that the problem was a matter of public concern. UTHCT maintained, however, that the content, context, and form of Brown's "speech" was simply a series of complaints stemming from Brown's personal conflict with his girlfriend's father and was thus not a matter of public concern. We agree with UTHCT.

 It is well-settled that a state cannot condition public employment on a basis that infringes upon the employee's constitutionally protected interest in freedom of expression. *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). A First Amendment violation occurs when the State, state agency, or political subdivision retaliates against an employee who exercises the right of free speech on a matter of public concern. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The threshold inquiry is whether the public employee's speech may be fairly characterized as constituting speech on a matter of public concern. *Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987); *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689, 75 L.Ed.2d 708. If Brown's speech cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for his removal. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690, 75 L.Ed.2d 708. When a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, the courts are not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency in reaction to the employee's behavior. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690, 75 L.Ed.2d 708. Whether the employee's speech addresses a matter of public concern must be determined by the content, form, and context of his speech. *Id.* The inquiry into the protected status of speech is one of law, not fact. *Id.* n. 7, 10.

In the instant case, it appears from the entire summary judgment record that Brown's "speech" was the result of his ongoing conflict with Dale Geddie, his girlfriend's father. A confrontation between the two men occurred in the UTHCT cafeteria in which harsh words were spoken. Although Brown alleged more than once that he was "assaulted" by Geddie, on deposition he admitted that Geddie did not touch him. He further admitted that his interest in the matter was personal and related to a family dispute. Although Brown claimed that he was speaking out about the failure of UTHCT to provide a safe workplace, he cited no incident of unsafe conditions other than his own confrontation with Geddie. Moreover, he admitted that he was mainly complaining about the alleged "assault" upon him by Geddie. And as shown by the letter from Director Hurst, other officials at UTHCT had already been designated to formulate policy for providing a safe workplace.

The court in *Connick* was particularly sensitive to the ease by which a plaintiff could attempt to elevate a personal matter to a matter of public concern and stated:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149, 103 S.Ct. at 1690, 75 L.Ed.2d 708. From the context, content, and form of Brown's speech as revealed by the record, we hold that Brown's speech cannot be fairly characterized as constituting speech on a matter of public concern. Thus, the trial court was correct in granting summary judgment for the individual defendants on Brown's cause of action alleging a violation of his free speech rights.

*QUALIFIED IMMUNITY*

Brown, in his Original Petition, sued Viken, Kronenberg, and DeWet, in their individual and official capacities under 42 U.S.C. § 1983, alleging that they violated his established constitutional rights to due process and free speech under the First and Fourteenth Amendments to the UNITED STATES CONSTITUTION. The three individual defendants, in their responses, asserted the affirmative defense of qualified immunity. Government officials performing discretionary functions generally are shielded from liability or civil damages under federal law insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would be aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 817–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because we have concluded that their conduct did not violate clearly established statutory or constitutional rights of Brown, we do not address the qualified immunity issue.

Brown's sole point of error is overruled. Accordingly, the judgment of the trial court is affirmed.