**Dr. Kenneth LEVI, Plaintiff–Appellant,**

v.

**UNIVERSITY OF TEXAS AT SAN ANTONIO, et al., Defendants–Appellees.**

**No. 86–2729.**

United States Court of Appeals,
Fifth Circuit.

March 23, 1988.

George M. Kirk, Jr., Houston, Tex., for plaintiff-appellant.

Jim Mattox, Atty. Gen., Austin, Tex., for Express Mail Delivery.

Lou Bright, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before RUBIN, GARZA, and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

After a state university assistant professor had been denied tenure, he sued the university and several officials, invoking § 1983 and asserting that the university had denied him procedural due process and equal protection of the laws in its tenure decision and had conspired to silence the dissent of faculty members who had favored his candidacy. The district court directed a verdict at the close of testimony on the conspiracy claim. The jury then found that the professor had no property interest that would entitle him to the protection of procedural due process, but that he had been denied equal protection. The district court, however, entered a directed

verdict on the equal protection claim because the professor had introduced insufficient evidence to create a jury question. Because a rational trier of fact could not find that the university's decision failed to bear a rational relation to a legitimate state interest, and because Dr. Levi also presented insufficient evidence on his conspiracy theory to create jury questions, we affirm the directed verdict on both claims; and we also affirm the judgment concerning due process.

## I.

Dr. Kenneth Levi was a tenure-track assistant professor of sociology at the University of Texas at San Antonio (UTSA), an institution at which by the end of the sixth year of their employment, tenure-track professors must either be awarded tenure or be given a terminal contract. University regulations prescribe three criteria on which all faculty members are evaluated for tenure: research, teaching, and service. During Dr. Levi's sixth year of employment, the University's tenure-evaluation process began with the review of his qualifications by a Division Faculty Review Committee. This committee consisted of all tenured faculty members of Dr. Levi's division, none of whom had been trained in the discipline of sociology.

During the committee's deliberations, some members expressed concern over Dr. Levi's leniency in grading and his policy of allowing students to choose the relative weight to be given to each of their assignments in determining their grades. Although Dr. Levi had received positive appraisals of his teaching in a preliminary tenure review the previous year and on student evaluation forms, these committee members concluded that the students' favorable evaluations of his courses could not be trusted, because of the popularity of his grading system, and that his leniency cast doubts on his effectiveness as a teacher. Other members of the committee, however, argued that Dr. Levi's grading system was an inappropriate criterion on which to judge his qualifications because the same factor was not being considered in evaluating other faculty members who were candidates for tenure at the same time.

Members of the committee also differed on the quality of Dr. Levi's scholarly publications. A majority of the committee members viewed the quality of his work as substandard, but other members disagreed, basing their conclusion on generally favorable reviews from scholars outside of the University who had been trained in sociology and a non-tenured sociologist at the University who had addressed the committee on Dr. Levi's behalf.

By a vote of seven to five, the committee decided not to recommend tenure, and it submitted a report with its recommendation to Dr. Thomas Bellows, the division director. Two of the dissenting committee members joined in a minority report that accompanied the majority report, arguing that Dr. Levi deserved to be awarded tenure but conceding that they believed the committee had followed proper procedures in reviewing his application.

Despite the unfavorable committee report, Dr. Bellows subsequently recommended to Dr. Dwight Henderson, the dean of the College of Humanities and Social Sciences, that Dr. Levi be granted tenure. Another, college-wide committee reported to Dean Henderson, recommending that Dr. Levi be denied tenure. Dean Henderson recommended to his superior, University Vice–President Gordon Lamb, that Dr. Levi's contract be terminated. In his report, Dean Henderson expressed concern over Dr. Levi's grading policies, stating that the "reaction from the Division faculty and outside evaluators [was] mixed" and that he thought Dr. Levi's "teaching standards [were] inadequate."

Following receipt of Dean Henderson's recommendation, Vice-President Lamb met with Dean Henderson and with Dr. James Wagener, the president of UTSA. Based on their discussions and a review of the various recommendations, Dr. Wagener made the final determination to recommend to the Board of Regents of the University that Dr. Levi be terminated.

At the same time, Dr. James Dykes, a psychology assistant professor, received

tenure. Dr. Levi contends that he was better qualified than Dr. Dykes in several respects, including the quantity of his research, student evaluations of his teaching performance, and the extent of his community service.

Dr. Levi sued in federal court, contending that (1) the University violated his right to equal protection by treating him differently from other candidates for tenure, in particular Dr. Dykes, without any rational reason and (2) the University violated his right to procedural due process by failing to accord him a hearing after it had notified him of the decision to deny him tenure. During the pendency of the lawsuit, Dr. Levi added a claim that the University, its officials, and its legal counsel had conspired, in violation of 42 U.S.C. § 1985(2), to intimidate the faculty members who had joined in the minority committee report from appearing as witnesses at trial by questioning them, seeking to coerce statements from them, and reducing their merit pay increases.

The claims against the University having been dismissed on the ground of Eleventh Amendment immunity, the case proceeded to trial on the claims against the University administrators. After the close of testimony, the officials moved for a directed verdict on all counts. The district court granted a directed verdict in favor of the University officials on the § 1985(2) conspiracy claim but held the motion for a directed verdict on the other claims in abeyance. The jury found that Dr. Levi had not been deprived of a property interest without due process, but it rendered a verdict in his favor on the equal protection claim. The district court, however, then granted a directed verdict in favor of the University on the equal protection claim pursuant to Federal Rule of Civil Procedure 50.

## II.

Although the district court gave no reasons for its directed verdict, we infer, based on the authority it cited,[1] that the court believed the evidence insufficient to support the jury's findings that Dr. Levi had been treated differently from other similarly situated persons without a rational basis or legitimate state purpose. The jury's verdict must be upheld unless the facts and inferences point so strongly against the verdict that a rational trier of fact could not have reached it.[2]

> The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.[3]

The sufficiency of the evidence, of course, depends on the standard against which it is measured. This case, as both sides agree, involves no suspect classification, such as race, sex, alienage, or national origin, that triggers a searching inquiry into the justification for state action. Dr. Levi, therefore, must show at least that he was treated differently from other tenure candidates and that this treatment lacked a rational relation to a legitimate state interest,[4] a standard whose substance the district court presented to the jury. The University officials have not raised, and therefore we do not consider, whether Dr. Levi's claim must fail because he has not alleged class-based discrimination[5] or be-

1. *Lubbock Feed Lots, Inc. v. Iowa Beef Processors,* 630 F.2d 250, 268–69 (5th Cir.1980).

2. *Boeing Company v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc).

3. *Id.* at 374–75 (footnotes omitted).

4. *See, e.g., City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

5. *Contrast* 2 Rotunda, Nowak & Young, Treatise on Constitutional Law: Substance and Procedure § 18.2 at 317–18 (1986); *Parham v. Hughes,* 441 U.S. 347, 358, 99 S.Ct. 1742, 1749, 60 L.Ed.2d 269 (1979) (plurality opinion); *Grif-*

cause a challenge to a tenure decision under the equal protection clause is nonjusticiable unless the plaintiff alleges discrimination based on race, sex, or the exercise of a constitutional right.[6]

Dr. Levi's chief allegation of differential treatment was that the University faulted the policies he used in grading students but did not consider this factor for Dr. Dykes, the candidate who received tenure at the same time. Indeed, Dr. Levi predicated virtually his entire equal protection case on comparisons between his credentials and those of Dr. Dykes. The University argued that refusing to award tenure to teachers who give overly-high grades serves to maintain the quality of its faculty, a purpose that the district court correctly instructed the jury was legitimate.[7]

To show that he received different treatment, Dr. Levi presented the testimony of faculty members Drs. Almaraz and Urdaneta, the authors of the minority report from the division-level committee. They stated that grading policies had either not been considered before or had received greater emphasis for Dr. Levi than for other candidates. The record did contain uncontroverted evidence that Dr. Dykes gave low grades and University officials thought this "speaks well" of his standards for student performance. This, however, would not foreclose the possibility that the issue of grading policies was magnified out of proportion for Dr. Levi as compared to Dr. Dykes and the two therefore were treated differently.

We need not resolve that question, however, for in any event the jury could not conclude that this distinction bore no rational relation to the legitimate purpose of maintaining the quality of the University faculty. The rational-basis test generally requires only that the relation to the state's purpose be "at least debatable." [8] The test does not permit a judge or jury simply to second-guess University officials' academic judgment concerning a tenure decision. As this court has on various occasions stated, the equal protection clause does not require "mathematical perfection" in distinctions between tenure candidates,[9] and "the mere assertion of such a constitutional claim does not convert the federal procedure into a plenary administrative review." [10] To the extent a decision concerning a teacher's or student's academic performance requires "an expert evaluation of cumulative information," it lends itself poorly to judicial review.[11]

In *Regents of University of Michigan v. Ewing,*[12] the Supreme Court held that, in evaluating a claim that an academic decision denied the plaintiff substantive due process, a federal court should respect the faculty's professional judgment and may override the decision only if it departs so substantially from accepted academic norms as to indicate the faculty did not actually exercise that judgment. This principle extends as well to cases in which the plaintiff asserts he has been denied equal

*tin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971); *Ballard v. Blount,* 581 F.Supp. 160, 166 (N.D.Ga.1983), with *Zeigler v. Jackson,* 638 F.2d 776, 779 (5th Cir. Unit B 1981); *Gosney v. Sonora Independent School Dist.,* 603 F.2d 522, 526–28 (5th Cir.1979); *Ciechon v. City of Chicago,* 686 F.2d 511, 522 (7th Cir.1982).

6. Contrast *Clark v. Whiting,* 607 F.2d 634, 638–41 (4th Cir.1979); *Faro v. New York University,* 502 F.2d 1229, 1231–32 (2d Cir.1974), with *Wells v. Doland,* 711 F.2d 670, 675 (5th Cir.1983); *see also Ferguson v. Thomas,* 430 F.2d 852, 857 (5th Cir.1970).

7. *See, e.g., Wells,* 711 F.2d at 675; *Megill v. Board of Regents of State of Florida,* 541 F.2d 1073, 1082 (5th Cir.1976).

8. *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 881, 105 S.Ct. 1676, 1683, 84 L.Ed.2d 751 (1985); *see also Stern v. Tarrant County Hospital,* 778 F.2d 1052, 1056, 1061 (5th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986).

9. *Wells,* 711 F.2d at 675.

10. *Megill,* 541 F.2d at 1077.

11. *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (quoting *Board of Curators, Univ. of Missouri v. Horowitz,* 435 U.S. 78, 89–90, 98 S.Ct. 948, 954–55, 55 L.Ed.2d 124 (1978)).

12. 474 U.S. 214, 106 S.Ct. 507, 513, 88 L.Ed.2d 523 (1985).

protection because the faculty erred in evaluating his qualifications as compared to those of another candidate.

Dr. Levi argued primarily that the faculty and administrators erred in evaluating the effect of his grading policies on his teaching. The University maintained that Dr. Levi's record of giving high grades and allowing students to choose the weight each assignment would receive cast serious doubt on his teaching effectiveness.[13] These policies, it contended, might permit a student to make good grades without really learning skills, with obvious detrimental effects both on the student and on the University's credibility. The University also pointed out that Dr. Levi's lenient grading policies might explain his students' enthusiasm for his teaching. Dr. Levi countered that these concerns were unfounded because high grades often mean students are learning more and because he was teaching upper-level classes with mature students interested in the subjects being covered.

Dr. Levi's contentions might show the University's decision was unwise, but not that it was irrational. These matters were certainly debatable; they called for the exercise of professional judgment, and a reasonable jury could not find that the University officials failed to exercise that judgment or ventured "beyond the pale of reasoned academic decision-making."[14]

Dr. Levi asked the jury to infer that the University officials were biased toward him from the fact that the justification they offered—doubt about his teaching effectiveness—was irrational. We may assume, however, without deciding, that he also could properly adduce proof that this justification, even if rational, was a pretext for a decision actually taken out of irrational ill-will.[15] Dr. Levi presented no direct evidence of such illicit motivation and insufficient evidence to permit the jury to infer it. That the decision to deny him tenure was mistaken would not alone prove it was spiteful. Overwhelming evidence, moreover, indicates that the University officials did decide in good faith after conscientiously considering Dr. Levi's credentials. His case proceeded through all levels of review and was deliberated by two committees. Indeed, the University permitted two additions to the usual procedure—a non-tenured UTSA sociologist addressed the division-level committee on Dr. Levi's behalf, and those committee members who supported his tenure application filed a detailed dissenting report.

Dr. Levi draws a number of other comparisons between himself and Dr. Dykes that allegedly show his application received short shrift. Even assuming, however, that he was treated differently in these respects, in each case the University officials advanced a debatably rational justification. It was not irrational to downplay the quantity of Dr. Levi's scholarly work and focus on its quality or to discount the complimentary evaluations of it from outside reviewers as faint, and therefore damning, praise. Nor was it irrational for the officials to downplay Dr. Levi's community service, which was admittedly extensive, and focus on his scholarship and teaching. All of these decisions were at least debatable, and none reveals a failure to exercise professional judgment.

Finally, Dr. Levi contends that the committee reports presented to the University's administrators were biased because they presented Dr. Dykes's credentials in the most favorable light while ignoring many of Dr. Levi's stronger qualifications, including, among other things, his community service, favorable reactions from students and outside experts, and successful efforts in obtaining several research grants for the University. While there are differences in the two reports, these do not constitute sufficient evidence that the committees acted irrationally or failed to exercise their professional judgment. The choice of

13. *See also Megill*, 541 F.2d at 1082.

14. *See Ewing*, 106 S.Ct. at 514–15.

15. *Cf. Shelton v. City of College Station*, 780 F.2d 475, 480–82 (5th Cir.1985) (en banc), *cert. denied*, —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *Stern*, 778 F.2d at 1060–61; *Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d 921, 934–35 (5th Cir.1988).

what to include in a report is inevitably somewhat subjective. The reports concerning Dr. Levi summarized, though perhaps not perfectly, his credentials and the committees' reactions to him. Dr. Levi's argument demands the kind of mathematical precision in tenure decisions that we have held the equal protection clause does not require.[16]

### III.

■ The district court did not err in failing to grant a directed verdict in Dr. Levi's favor on his procedural due process claim. He does not assert that any state statute or University regulation gives him a property right in being considered for tenure, only that his property interest lay in "not being denied tenure *on the basis of constitutionally impermissible reasons.*" Leaving aside the threshold question whether this indeed constituted a property interest, we find that absent a favorable verdict on his equal protection and other constitutional claims, Dr. Levi cannot demonstrate that the University denied him this property right by making an improper tenure determination. We therefore affirm the judgment in favor of the University officials on this issue.

Dr. Levi's final argument on appeal is that the University, its officials, and its attorneys conspired to intimidate the faculty members who had joined in the minority report and prevent them from testifying in this suit. Because Dr. Levi failed to present any evidence before the district court of any mutual understanding among the defendants to accomplish a wrongful plan—evidence required for a conspiracy claim[17]—the district court's directed verdict on this issue was proper. To recover under § 1985(2), moreover, the plaintiff must prove a racial or class-based animus,[18] which Dr. Levi did not do.

### IV.

Juries and judges lack the credentials and the knowledge to determine whether a group of scholars should be required to accept into their midst for life a member of the academic community. When a decision to grant or deny institutional tenure has been reached, the constitutional protections against arbitrary state action, accorded by the due process clause, and against the denial of equal treatment, guaranteed by the equal protection clause, assure that state institutions will reach their decisions in a procedurally fair manner and that their decisions will be rationally based on considerations relevant to future academic performance. While we recognize that the denial of tenure to a professional teacher after long years of service to an institution visits a profound hardship on him and his family and may indeed blight his professional future, we must recognize too that the future of the academic institution and the education received by its students turn in large part on the collective abilities and collegiality of the school's tenured faculty. To overturn an institutional judgment so meticulously arrived at as the one made by the state university officials in this case requires more evidence than Dr. Levi mustered.

For these reasons, we AFFIRM the judgment of the district court.

16. *Wells,* 711 F.2d at 675.

17. *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir.), *cert. denied* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *see Thomas v. City of New Orleans,* 687 F.2d 80, 83 (5th Cir.1982).

18. *Kimble v. D.J. McDuffy, Inc.,* 648 F.2d 340, 346 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).