Dr. Ali Kanso EL–GHORI, Plaintiff,

v.

Dr. Thomas GRIMES, Dr. Charles Pearce, Dr. Peter J. Nicholls, Dr. Jon Wefald, and Kansas State University, Defendants.

No. 97–1434–WEB.

United States District Court, D. Kansas.

Sept. 24, 1998.

Sheila P. Hochhauser, Manhattan, KS, Martin F McMahon, Martin F. McMahon & Assoc., Washington, DC, for plaintiff.

Jennifer Kassebaum, Kansas State University, Legal Department, Manhattan, KS, for defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on the defendants' motion for summary judgment. (Doc. 25). The court finds oral argument would not assist in deciding the issues presented.

The plaintiff Dr. Ali Kanso El–Ghori (hereinafter Dr. El–Ghori) was employed from 1991 to 1997 as an Assistant Professor in the School of Journalism and Mass Communications at Kansas State University. He held a probationary "tenure track" position and was annually reappointed through 1997. In 1997, his application for tenure and promotion was denied. Plaintiff subsequently filed this action against the University, the President of KSU, the Dean of the College, and two tenured faculty members who had opposed his application for tenure. The complaint asserts claims for defamation, gross negligence, "Intentional and Malicious Interference with Tenure Process," a civil conspiracy to deprive plaintiff of the equal protection of the laws in violation of 42 U.S.C. § 1985, and a claim for injunctive relief under 42 U.S.C. § 1983. Jurisdiction is alleged under 28 U.S.C. §§ 1332 and 1343.

The defendants correctly point out that plaintiff has failed to comply with this court's local rule requiring the party opposing summary judgment to specifically controvert any facts in the movant's motion that are disputed. D.Kan.R. 56.1. In accordance with that rule, those facts set forth by the defendants that are not specifically controverted in plaintiff's response are deemed admitted. Having said that, the court notes that defendant's reply brief refers only sporadically to the ten-page, single-spaced statement of facts in plaintiff's response. Under the circumstances, the court has attempted to combine the parties' statements, together with undisputed portions of the record, to set forth the uncontroverted facts for purposes of summary judgment. In doing so, the court has deleted those facts which are immaterial, unsupported by the record citation, or not based on the personal knowledge of the witnesses.

### I. Facts.

Policies adopted by Kansas State University define tenure as a continuous appointment that can be terminated only in unusual circumstances and then only after due process. Prior to being considered for tenure at KSU, a faculty member is annually appointed during an extended probationary period to assess the candidate's ability to contribute to the expertise and the versatility expected of the University's faculty. Versatility should be exhibited by the candidate's ability to function well across major areas of work including teaching, research and other creative endeavors, and service. Tenure is granted (by the Kansas Board of Regents) based on the assessment of the tenured faculty that a candidate has made outstanding contributions in appropriate academic endeavors. Tenure is not a right accorded to every faculty member. Nor is it granted simply as a result of a candidate's routinely meeting assigned duties with a record free of notable deficiencies. Because the granting of tenure is tantamount to a lifetime commitment, the University's policy is that the institution should be left without a reasonable doubt as to the faculty member's qualifications for tenure before it reaches a favorable decision.

The plaintiff, Dr. Ali Kanso El–Ghori, is a Lebanese-born Arab–American and practicing Muslim. From August 18, 1991, until May 11, 1997, plaintiff held a probationary faculty appointment as an Assistant Professor in the A.Q. Miller School of Journalism and Mass Communications at Kansas State University. Defendant Charles Pearce was Chair of the Search Committee that brought plaintiff to KSU and voted affirmatively for plaintiff's initial hire. Plaintiff joined two other faculty members in the advertising sequence of the School. Plaintiff's initial appointment and each subsequent annual appointment provided that a final tenure review

and determination for him would occur no later than the 1995–96 academic year.

In his first two academic years (1990–91 and 1991–92), plaintiff experienced some difficulty teaching a large open-enrollment introductory course, "Principles of Advertising." In written student evaluations, there were complaints from approximately twenty percent of his students that they found him hard to understand—apparently because of his accent. Depo. Exh. D–6. The first faculty review of Dr. El–Ghori, for 1990, noted that he had received poor student evaluations and concluded that he "needs to improve his teaching considerably." *Id.*[1]

The faculty review for 1991 stated that Dr. El–Ghori "has worked hard to improve his teaching, and has clearly made progress." *Id.* It again noted his difficulty with teaching large classes and stated that he "clearly relates better with students in a small class." *Id.* It noted that in large classes "[a] lot of students have trouble understanding him." *Id.* The faculty review for 1992 likewise noted that Dr. El–Ghori seemed to do better with students in smaller classes and that students in the large class complained about not understanding him, although the review said that student comments in the large class were much better this year than previously.

The Director of the School, Dr. Carol Oukrop, discussed with plaintiff as part of his annual evaluations the poor student evaluations plaintiff received in large classes, including the Advertising Techniques course. Plaintiff testified that Dr. Oukrop told him these were only minor concerns and that she never told him these deficiencies would impact his tenure and promotion.

According to the criteria adopted by the KSU School of Journalism, "[t]eaching, in all of its forms, is the foremost duty of a faculty member. As a result, the School places strong emphasis on instructional excellence and makes it a foundational consideration in the initial appointment of faculty and in the awarding of tenure and promotion."

The first comprehensive evaluation of the plaintiff occurred in his third academic year, 1992–93, with a "mid-term review." A mid-term review is supposed to provide the faculty member with feedback about whether or not his performance is in line with departmental tenure criteria. A positive mid-term review, however, does not insure that tenure will be granted in the future; nor does a negative review necessarily mean that tenure will be denied. The department head is responsible for making the candidate's file available to tenured faculty members in the department and is advised by them regarding the candidate's progress. The department head discusses the review with the dean and provides the candidate with a letter of assessment.

During the 1992–93 academic year, School Director Dr. Carol Oukrop and plaintiff forwarded plaintiff's mid-probationary review materials to the Dean of Arts and Sciences. At the tenured faculty meeting where plaintiff's mid-probationary performance was reviewed, there were questions about his performance but it was unanimously agreed to reappoint plaintiff for another academic year.

Relying upon the materials submitted by the school's director and upon the tenured faculty's unanimous approval, Dean Peter Nicholls prepared a letter dated May 26, 1993, reappointing plaintiff for the next year and summarizing plaintiff's mid-probationary review. The dean made no representations

---

1. The review also included comments from Dr. Richard Nelson, who was apparently plaintiff's faculty mentor at the time. Dr. Nelson discounted student complaints about Dr. El–Ghori:

> I find Dr. Ali Kanso El–Ghori to be a well-educated, articulate, and dedicated faculty member. I believe he contributes meaningfully to the School's goals of expanding cultural diversity and enhancing JMC's international perspectives in teaching and research....
> Given the existing ethnocentrism of many of our students, I would *not* be surprised to see a wide range in their evaluations of his teaching. I have heard a few students grumble over the amount of work they have to do in his classes and the fact that he has a slight accent. After seeing him using the Socratic method of question-interaction on a first name basis with numerous students in his large Principles of Advertising class, I tend to discount most of these complaints. I sat in the back and understood him perfectly well, and it was plain that a number of students had done the readings and knew the material well while others expected to have it spoon fed to them and were not mentally engaged in fulfilling their part of the educational contract.

to plaintiff concerning tenure and promotion other than what is contained in the May 26 letter. The dean's letter did not specifically address student evaluations of plaintiff's teaching performance in large classes. The letter stated in part:

Your colleagues have noted that your teaching performance has shown consistent improvement since your arrival here. With our very limited resources, we must be sure that all of our faculty interact well with students and are able to communicate clearly with them. You are fortunate to work in a Department with high standards in teaching, and I encourage you to enlist the support of your colleagues in the teaching area.

Your research work seems to be well focussed on important topics, and you are to be commended for your progress in this area. Your recent research is appearing in the leading peer-reviewed journals in the field, and we encourage you to continue with this effort. I would also encourage you to continue seeking extramural support for your work.

You are a valued member of our faculty and I know that your continued efforts in scholarship and teaching will keep you on track for a positive tenure decision at the appropriate time.

The plaintiff viewed the mid-term review as solid feedback on his tenure and thought that "the Dean was delivering a promise ... that he would give me tenure if I continued working hard." The plaintiff was worried about the mid-term review; he had been told of its significance by the faculty and knew of at least five instances where candidates were asked to leave the school due to their poor performance early in their position.

Every year, plaintiff had received unanimous annual reappointments and had received concomitant merit salary increases. After his first year he received an 8.8% raise, which was the highest in the school. He received a median raise after his second year.

Granting tenure to plaintiff would have resulted in less flexibility for the other two faculty members in the advertising sequence. Dr. Oukrop, who supported plaintiff's application for tenure, confirmed in her deposition that after 1992 the school did not feel comfortable in placing Dr. El–Ghori in the large Principles of Advertising course or in the Advertising Techniques course. The Advertising Techniques course required proficiency in computer technology, and Dr. Oukrop testified this was not an area of strength for Dr. El–Ghori. Associate Director Dr. Paul Parsons, who was responsible for making the teaching assignments, testified in his deposition that Dr. El–Ghori could teach certain courses in the core advertising sequence and not others, and that he chose in consultation with the advertising sequence head and director to orient Dr. El–Ghori toward smaller classes.

In 1993, Dr. El–Ghori was only given small classes to teach. His student evaluations for that year were only slightly below the school's mean and for some classes were among the highest in the school. The faculty review for that year stated that his teaching "continues to improve, in some cases dramatically, as he becomes more and more familiar with the needs of Kansas State students." Likewise, in 1994, he taught small classes and his student evaluations were slightly above the school's mean. The faculty review for 1994 noted that "[t]here is some concern regarding Ali's 'fit' as a team player in the advertising sequence, but Ali is working on this and the situation has improved."

In the six semesters preceding his tenure application, Dr. El–Ghori's teaching evaluations as rated by the school's guidelines were: 1 needs improvement, 2 meets expectations, 3 meritorious, and 8 outstanding. The "needs improvement" rating occurred in the Fall of 1993. The School offered 45–47 courses each semester.

Plaintiff's performance in the area of research includes publication in one leading journal, with publication occurring prior to the mid-probationary review.

Of plaintiff's four articles published after his mid-tenure review, two were jointly authored with Dr. Richard Nelson, a former faculty member at Kansas State University who has been retained by plaintiff to serve as his expert witness concerning plaintiff's qualifications for tenure.

According to the plaintiff, Dr. Nelson had told him constantly to "watch out; this is Kansas; you're foreign born; be careful." He also told Dr. El–Ghori not to broadcast the fact that he was a Muslim. He commented that "some people here don't want to hear that ." He also told Dr. El–Ghori that Dr. Pearce was a conservative Christian and to be careful about his Muslim faith with Pearce.

At the time of the Oklahoma City bombing, Dr. Thomas Grimes, a tenured faculty member in the school, went to watch the news on television in the newsroom of the College. He called someone on the telephone; plaintiff heard Grimes say in that conversation that "there seems to be an Arab connection."

When a colleague threw a party for Dr. El–Ghori for obtaining American citizenship, Dr. Grimes did not attend. Dr. El–Ghori believed that Dr. Grimes hated him. He testified in his deposition that he had saluted Dr. Grimes hundreds of times but Dr. Grimes "barely saluted or reciprocated with me." Dr. El–Ghori explained that there were a number of possible reasons for this, including that he believed his research was a threat to Dr. Grimes, that plaintiff asserted there was a lack of research mentoring when the university was reviewed by an accrediting committee (which reflected poorly on Dr. Grimes as the Chair of the Research Department), and that Dr. El–Ghori voted against hiring a good friend of Dr. Grimes.

Dr. Pearce asked Dr. El–Ghori on one occasion in 1993 and one occasion in 1994 whether he went to the mosque and whether he prayed and fasted. He did not make any disparaging comments about the Muslim faith. Dr. El–Ghori thought there was something behind the questions because they were asked on more than one occasion. Dr. Pearce did not attend two student advertising presentations at the school, explaining to Dr. El–Ghori that he had some obligation at his church. Dr. El–Ghori believed that "when you have someone who's very curious about you to know about your religion, at the same time he doesn't have time to come to School because he is [a] practicing Christian, it shows me in one way or another that he has some attitude toward me as a Muslim."

Neither Dr. Grimes nor Dr. Pearce socialized with the plaintiff.

Plaintiff's performance was without notable deficiencies after the mid-probationary review, but there continued to be concerns about his teaching.

In September of 1995, the tenured faculty of the Journalism School met and discussed plaintiff's application for tenure and promotion. In accordance with university policy and practice, the entire six-year probationary period was considered. In that meeting, Dr. Pearce expressed his reservations about the plaintiff's inability to teach the Principles of Advertising and Advertising Techniques courses because that inability would limit the other faculty in the courses they could teach. Pearce Depo. at 7. Dr. Pearce had previously expressed to Dr. Oukrop his desire not to have to teach the Principles of Advertising course all the time. Id. at 18. He wanted some relief in that area (to have someone else teach the course) so that he could concentrate on other courses. Id. at 19. One of the reasons Dr. El–Ghori was hired was to provide relief in the teaching of the large introductory courses such as Principles of Advertising.

The recommendation of the school's tenured faculty was four in favor of tenure, three opposed, and two abstentions, with the department head supporting plaintiff's application for tenure and promotion.

Although Dr. Pearce was Dr. El–Ghori's faculty mentor, he had not told Dr. El–Ghori that his inability to teach the large classes was going to impact his tenure candidacy.

The tenured faculty voted without having reviewed letters from faculty outside of the school (outside reviewers), which was the school's practice, although the school's written procedures provide for such information to be available for review prior to voting.

Dr. Grimes submitted a written statement of his opinions of plaintiff's qualifications for tenure and promotion in a letter dated November 8, 1995. The submission of this statement was in accordance with the university procedures which invited unedited comments by tenured faculty members to be submitted in an applicant's tenure packet.

Dr. Grimes showed his written comments to the School's Director and Associate Director and asked them to review the statement for fairness and accuracy. The statement was included in plaintiff's tenure application materials submitted by the Director to the Dean, to the College Advisory Committee, and to the Provost, all of whom receive and review unedited comments from tenured faculty as part of the tenure review process. Dr. Pearce never saw Dr. Grimes' letter.

Dr. Grimes' letter stated that it was intended to persuade the Dean not to recommend tenure and promotion for Dr. El–Ghori. The letter was critical of Dr. El–Ghori's teaching ability. Grimes stated that he had attended part of a class taught by Dr. El–Ghori in which students were yelling epithets at Dr. El–Ghori and were on their feet visiting with each other. He asserted that the School had decided not to assign any more large classes to Dr. El–Ghori because it feared he would be unable to control them. He stated that Dr. El–Ghori had an "intellectually rigid[ ]," "paint-by-numbers approach" to teaching and was unable to accommodate student views that departed from principles outlined in textbooks. As for Dr. El–Ghori's published research, Dr. Grimes stated that it was "inadequate and amateurish." He was critical of Dr. El–Ghori's use of statistics, asserting that Dr. El–Ghori had left a statistical analysis incomplete in one of his published articles. Grimes expressed the view that Dr. El–Ghori's research showed no promise of having any important influence in the field. Dr. Grimes' letter also contained some positive comments. For example, Grimes stated: "[Dr. El–Ghori] is as dedicated to his job as anyone on the faculty. He comes in earlier and stays later. I genuinely believe that he cares for K–State and his students, and that he takes his position here seriously." Dr. Grimes later met with the Dean to discuss the plaintiff's candidacy.

Dr. Grimes had made similar comments at the September, 1995 tenured faculty meeting. Dr. Robert Daly, a tenured faculty member, considered this to be an "unfair, unprofessional and uncalled for attack on Dr. El–Ghori's teaching ability and his published record and substance." He was particularly upset that Dr. Grimes had never made mention of Dr. El–Ghori's alleged incompetency before this occasion.

Dr. Grimes did not share the plaintiff's research specialty of international public relations, marketing and advertising, and he had never published on that topic.

Pursuant to university procedures, plaintiff's application for tenure was considered and voted upon by the college faculty committee advisory to the dean. The vote of that committee was five members opposed to tenure, no members in support of tenure, and one abstention. Prior to its vote, the college advisory committee considered plaintiff's tenure application materials, including letters from outside reviewers and unedited comments from tenured faculty.

Based upon the college advisory committee vote and the split vote of the faculty in the school, Dean Peter Nicholls recommended against tenure. In his letter to the Provost, Nicholls stated:

The College Committee and I have several concerns about Professor El–Ghori's record in teaching, noting particularly that he apparently does not function well at all in large lecture classes. This really limits his flexibility and usefulness in the teaching mission of the School. In addition, some of his faculty colleagues are worried about overly formalistic teaching methods.

The research record is also a major concern since it seems clear that Professor El–Ghori's published work has not made a significant impact on the field—indeed the work appears to be viewed as somewhat routine by some of the outside reviewers.

In summary, Professor El–Ghori has not achieved the high levels of excellence either in teaching or in research that we expect for the granting of tenure in this College.

By letter dated December 19, 1995, plaintiff was notified that the dean recommended against tenure. Plaintiff was notified of the Provost's decision to concur with that recommendation by letter of February 20, 1996.

An outside reviewer submitted a letter in support of plaintiff's application on February 26, 1996, one week after the Provost's decision and approximately two months after the

Dean's and College Advisory Committee's recommendations.

Upon appeal by plaintiff, the Provost declined to modify the decision to deny tenure and promotion.

On September 24, 1996, plaintiff. filed a grievance with the general faculty grievance board to appeal the denial of tenure and promotion. Prior to the grievance hearing, plaintiff was given the opportunity to have the tenured faculty in the school reconsider his application for tenure after the faculty considered letters from outside reviewers, but plaintiff rejected this offer. Plaintiff was represented at the grievance hearing by an attorney and a faculty advisor. The hearing spanned approximately eighteen hours over the course of three meetings. Plaintiff called witnesses, and his spokesperson cross-examined all administrators involved in the initial decision.

The four members of the faculty grievance panel made numerous findings by a "clear and convincing evidence" standard. The panel found that several aspects of the school's treatment of Dr. El–Ghori's tenure application had violated the university's written procedures. It found that the university had failed to honor the purpose and spirit of the probationary period and failed to recognize, notify, and take steps to correct perceived deficiencies in Dr. El–Ghori's performance and credentials. In effect, the panel suggested, Dr. El–Ghori's mid-term review indicated that he was meeting tenure criteria but the same performance was found three years later not to have met the criteria. The panel also found it was a violation of procedures for the Dean not to forward a written recommendation and accompanying explanation to the Provost concerning Dr. El–Ghori's annual reappointments. Other violations found by the panel included a failure to have the complete tenure application, including external review letters, available for faculty review prior to voting, and a failure to apply the school's numerical rankings of teaching effectiveness as stated in the departmental tenure criteria. At the same time, the panel found no clear and convincing evidence that previous faculty had been granted tenure and promotions with notable deficiencies and less qualifications than the plaintiff, or that the Provost, Dean or Director had acted in an arbitrary or capricious manner in denying tenure; nor did the panel find any violation of procedure in Dr. Grimes' having submitted his letter regarding plaintiff's qualifications. Lastly, the panel found no clear and convincing evidence of discrimination against plaintiff based on his national origin, and noted that he had not filed a grievance with the Affirmative Action Office as required by university procedures.

The panel was divided in its recommendation concerning an appropriate remedy, with two members voting in favor of promotion and tenure, one against, and one recommending that one year should be added to plaintiff's probationary period.

As a result of plaintiff's failure to win the support of a majority of any of the three faculty groups that considered plaintiff's application for tenure and promotion, and in consideration of the university's tenure standards, university president Jon Wefald affirmed the denial of tenure and promotion.

II. *Defendants' Motion for summary Judgment.*

The defendants move for summary judgment on each of the claims in the complaint and assert a variety of defenses. The standards and procedures for summary judgment are well established and will not be fully repeated here. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In essence, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.*

A. *Eleventh Amendment Immunity.*

The defendants first argue that any claim against them in their official capacities is barred by the Eleventh Amendment. In response, plaintiff asserts that Dr. Jon Wefald ·is the only defendant being sued in his official capacity and that he can be sued as such because "plaintiff is only seeking prospective injunctive relief from him." Pl. Resp. at 1. In Count Six of the Complaint,

plaintiff asks the court to order Dr. Wefald to reinstate him and to grant him tenure. Doc. 1 at 17. Although it is true that a claim for prospective injunctive relief may fall outside the bar of the Eleventh Amendment, plaintiff fails to address the defendants' contention that President Wefald does not have the authority to perform the acts requested. *See* Def.Mot. at 14. Because of that failure, and because it appears from the record that only the Kansas Board of Regents has the authority to grant tenure (Depo.Exh. 19 at 23), the court finds that the defendants' are entitled to judgment on the claims against them in their official capacities. *Cf. Klein v. Univ. of Kansas Med. Center,* 975 F.Supp. 1408, 1417 (D.Kan.1997) (noting that under *Ex Parte Young,* the state official must have the power to perform the act required in order to overcome the bar of the Eleventh Amendment).

### B. *Claim under 42 U.S.C. § 1985.*

Plaintiff alleges that defendants Grimes, Pearce and Nicholls conspired to deprive him of the right to equal protection of the laws in violation of 42 U.S.C. § 1985. Specifically, plaintiff alleges that the "defendants' plan was to create a negative tenure package, laden with their untrue and misleading accusations and innuendoes, that would be sent to the Dean and the Committee for their review" and would thereby cause a denial of tenure for the plaintiff. Doc. 1 at ¶ 53.

Inasmuch as plaintiff does not allege the elements of a claim under § 1985(1) or (2), the court assumes that his claim is based on § 1985(3), which makes liable individuals who conspire to deprive any person or class of persons of the equal protection of the laws. Although the scope of this law is somewhat uncertain, it requires at a minimum "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). In an apparent effort to meet this requirement, plaintiff has alleged that Dr. Grimes had "ill feelings" against him arising in part from "the plaintiff's ethnic [arabic] background and religious [practicing muslim] background," and that Dr. Pearce "viewed the plaintiff as a foreigner who did not fit in at KSU." Doc. 1 at ¶¶ 51, 52. Even assuming that a conspiracy motivated by these factors would satisfy the "class-based animus" requirement, plaintiff has failed to produce any evidence that the defendants acted from such an animus. Plaintiff's subjective belief about what the defendants thought or what motivated them does not suffice to create a genuine issue of fact for trial. *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1408 n. 7 (10th Cir.1997). Similarly, the alleged statements of Dr. Grimes pertaining to "an Arab connection" to the Oklahoma City bombing and Dr. Pearce asking plaintiff about his Muslim faith do not reasonably suggest that these defendants had a discriminatory motive in opposing plaintiff's tenure. As for Dr. Nicholls, the complaint does not even allege a discriminatory animus on his part. The defendants offered a legitimate and neutral reason for opposing plaintiff's application for tenure. Plaintiff has cited nothing that would indicate this proffered reason was a pretext for discrimination. In sum, plaintiff has failed to produce any direct or circumstantial evidence that could reasonably support a finding the defendants were motivated by a class-based discriminatory animus. Additionally, the court notes there is no evidence of a meeting of the minds or agreement among these defendants to deprive plaintiff of the right to equal protection. *See Gallegos v. City and County of Denver,* 984 F.2d 358, 364 (10th Cir.1993), 508 U.S. 972, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993). As such, the defendants are entitled to judgment as a matter of law on the § 1985 claim.

### C. *42 U.S.C. § 1983—Equal Protection.*

Count Six of the complaint alleges that plaintiff was denied the equal protection of the laws because KSU failed to comply with its own tenure procedures; because the School failed to put him on notice during the probationary period of any teaching deficiency that would bar his tenure; because of "the malicious nature of defendants Grimes and Pearce's conduct regarding the merits of the plaintiff's candidacy;" and because of "Grimes' and Pearce's deficiencies as viable tenure candidates compared with the plaintiff's tenure record of accomplishment...." Doc. 1 at ¶ 69.

█ To prevail in an action under § 1983, a plaintiff must show the deprivation of a federally protected right by an individual acting under color of state law. *Hill v. Ibarra,* 954 F.2d 1516, 1520 (10th Cir.1992). The right to equal protection of the laws, as guaranteed by the Fourteenth Amendment, would clearly prohibit the defendants from intentionally discriminating against plaintiff because of his ethnic origin or religious beliefs. But as was noted above, plaintiff fails to cite any evidence from which one could reasonably conclude the defendants acted from such a motive.[2]

█ Insofar as the balance of plaintiff's equal protection claim is concerned, the court likewise concludes the evidence will not support a claim. Some courts have held that absent a discriminatory motive, the denial of a faculty promotion based on an assessment of the candidate's achievements is not justiciable in an action under § 1983. *See Clark v. Whiting,* 607 F.2d 634, 639 (4th Cir.1979). Others have suggested that a denial of tenure does not violate the right to equal protection so long as the determination bears some rational relationship to a legitimate state interest. *See Wells v. Doland,* 711 F.2d 670, 675 (5th Cir.1983). Under either standard the defendants are entitled to judgment as a matter of law in this case. In *Levi v. University of Texas at San Antonio,* 840 F.2d 277 (5th Cir.1988), the court applied the "rational basis test" in rejecting an equal protection claim and noted that this standard "requires only that the relation to the state's purpose be 'at least debatable.'" *Id.* at 280. The court explained:

> The test does not permit a judge or jury simply to second-guess University officials' academic judgment concerning a tenure decision. As this court has on various occasions stated, the equal protection clause does not require "mathematical perfection" in distinctions between tenure candidates, and "the mere assertion of such a claim

does not convert the procedure into a plenary administrative review." To the extent a decision concerning a teacher's or student's academic performance requires "an expert evaluation of cumulative information," it lends itself poorly to judicial review.

*Id.* (footnotes omitted). Because of these limitations, "a federal court should respect the faculty's professional judgment and may override the decision only if it departs so substantially from accepted academic norms as to indicate the faculty did not actually exercise that judgment." *Id.* (*citing Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). There is no dispute that Dr. El–Ghori had some difficulty teaching large classes. Although plaintiff attempts to characterize this problem as trivial in light of his other qualifications, the defendants and the University could legitimately consider it as an important factor weighing against the granting of tenure, particularly in light of the tenured faculty's desire for more help teaching large introductory classes. As far as his research accomplishments are concerned, plaintiff argues that his qualifications were better than other candidates (such as Dr. Grimes) who were granted tenure, and he cites the opinion of his expert, Dr. Nelson, to support his position. Clearly, some academicians viewed the plaintiff's research as significant. Others did not share that view. For example, the defendants have included the opinion of Dr. Thorson of the University of Missouri–Columbia, who assesses the plaintiff's research contribution as "weak." The point here is not to determine which view is better supported; that was the University's responsibility. The point is that "these matters were certainly debatable; they called for the exercise of professional judgment, and a reasonable jury could not find that the University officials failed to exercise that judgment or

---

**2.** Plaintiff's brief also alleges that he was discriminated against because of his accent. It is undisputed that students in large classes complained about not being able to understand plaintiff because of his accent. Assuming this was a basis of the defendants' opposition to plaintiff's tenure, no inference of ethnic discrimination arises in these circumstances because it is a matter clearly related to an essential part of

plaintiff's job performance. *See Jiminez v. Mary Washington College,* 57 F.3d 369, 380 (4th Cir. 1995) (concerns about professor's inability to communicate with students because of his accent did not imply discrimination). *Cf. Carino v. The University of Oklahoma Bd. of Regents,* 750 F.2d 815, 819 (10th Cir.1984) (accent could not be the basis of an adverse employment decision where it did not interfere with job duties).

ventured 'beyond the pale of reasoned academic decision-making.'" *Levi*, 840 F.2d at 281. Finally, plaintiff compares his qualifications to Drs. Grimes and Pearce, and makes a cryptic reference to a Dr. Lubbers, but he offers insufficient evidence from which one could reasonably conclude that he was treated differently from other similarly situated candidates such that his right to equal protection of the laws was violated.

The bases offered by the defendants for opposing Dr. El–Ghori's tenure application were rationally related to legitimate interests of the University. Although plaintiff intimates that Drs. Grimes and Pearce asserted these reasons only as a pretext for improper motives, he "cites no direct evidence of such illicit motivation and insufficient evidence to permit the jury to infer it." *Id.*[3]

### D. *Defamation.*

Plaintiff asserts a claim for defamation arising out of Dr. Grimes' written statement to the Dean and Advisory Committee concerning Dr. El–Ghori's qualifications. Dr. Grimes asserts various defenses to this claim. Among them, he argues that his comments are not actionable because they were matters of opinion and because they are protected by a qualified privilege. Because the court agrees with these two arguments, it does not address Dr. Grimes' other contentions.

### 1. *Failure to Show the Elements of Defamation.*

■ The elements of a defamation claim under Kansas law are: (1) false and defamatory words; (2) communication to a third party; and (3) resulting harm to the reputation of the person defamed. *Batt v. Globe Engineering Co.*, 13 Kan.App.2d 500, 774 P.2d 371, *rev. denied*, 245 Kan. 782 (1989).

■ The complaint identifies six allegedly false and defamatory comments by Dr. Grimes. Doc. 1 at ¶ 13. The first three of these (comments (a)–(c) in ¶ 13) are matters of pure opinion that are not capable of being shown true or false. For example, Dr. Grimes' assertions that plaintiff was a "lifer"

with whom the school would be stuck and that Dr. El–Ghori's published articles were "amateurish" are expressions of opinion not capable of being proven objectively false. Under the *Restatement (Second) of Torts* § 566, an opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. That is not the case here. Dr. Grimes' letter discloses the facts upon which he based his assessment. This is "pure opinion" in which "the maker of a comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character." *Id.*, comment b. As such, it is not actionable. *Id.* As for comments (d) and (e) of ¶ 13, such statements are capable of being false but are not defamatory in nature. The lone allegation in ¶ 13 that could be both false and defamatory—that Dr. Grimes "insinuated that the plaintiff had falsified research data"—is based on an unreasonable construction of Dr. Grimes' written statement. Dr. Grimes asserted that Dr. El–Ghori drew an inference or made an assumption from certain statistical data without having fully completed the analysis necessary to prove the inference; he in no way asserted that plaintiff "falsified research data." Under the circumstances, plaintiff has failed as a matter of law to establish the elements of defamation for any of the comments alleged in the complaint.

### 2. *Privilege.*

■ Even if the plaintiff could point to a genuine issue of fact on the elements of defamation, the court concludes that Dr. Grimes would be entitled to judgment on the grounds of privilege. Privilege is an affirmative defense to a defamation claim. *Turner v. Halliburton Co.*, 240 Kan. 1, 722 P.2d 1106, 1112 (1986). Whether a privilege is available depends on the status of the defendant and the content of the allegedly defamatory communication. *Id.* Kansas law grants a qualified privilege to those with a special interest

---

**3.** Although there may have been a failure to adequately communicate Dr. El–Ghori's alleged deficiencies to him during the probationary period, that alone does not show a deprivation of the right to equal protection. *Cf. Levi*, 840 F.2d at

278 (plaintiff was denied tenure despite the fact that he had received positive appraisals of his teaching in a preliminary tenure review and on student evaluation forms).

or duty in the subject matter of the communication. *Id.* It is generally restricted to situations "where public policy is deemed to favor the free exchange of information over the individual's interest in his or her good reputation." *Id.* One such example is for business or employment communications made in good faith and between individuals with a corresponding interest or duty in the subject matter of the communication. *Id.* at 1112–13. The question of whether or not a publication is privileged is a question of law to be determined by the court. *Id.* at 1113.

The court has little trouble concluding that Dr. Grimes' written statement as part of the tenure process is the type of comment protected by qualified privilege. University faculty have a special interest in expressing their assessment of potential faculty members, and public policy clearly favors free and candid discussion in higher academic institutions insofar as selection of their members is concerned. *See e.g., Eldeeb v. Univ. of Minnesota,* 864 F.Supp. 905, 912–14 (D.Minn. 1994), *aff'd,* 60 F.3d 423 (8th Cir.1995); *Stukuls v. State of New York,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829 (Ct.App.1977) (comments in tenure process protected by qualified privilege).

■■■ Where a qualified privilege applies, the plaintiff has the burden of proving the statement was made with actual malice. *Turner,* 722 P.2d at 1113. "Actual malice" is a term of art in a defamation claim; it means that the false statement was made with knowledge that it was false or with reckless disregard of whether it was false or not. *See Schulze v. Coykendall,* 218 Kan. 653, 661, 545 P.2d 392, 399 (1976) (overruled in part on other grounds by *Schulze v. Board of Education,* 221 Kan. 351, 559 P.2d 367 (1977)). As such, it is not equivalent to the "bad motive or ill will" ordinarily associated with "malice" (*see Harte–Hanks Comm. v. Connaughton,* 491 U.S. 657, 667 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)), although Kansas law appears to require proof of both concepts where a qualified privilege applies. *See Turner,* 722 P.2d at 1113 (plaintiff must show "actual evil-mindedness or specific intent to injure").

■■■ Plaintiff has failed to cite evidence from which a reasonable jury could find actu-al malice. Nothing has been cited to show that Dr. Grimes made his allegedly defamatory statements knowing they were false or with reckless disregard as to whether or not they were false. Nor is there evidence to reasonably suggest Dr. Grimes was motivated by "evil-mindedness or specific intent to injure." Dr. Grimes' criticisms focused on areas of legitimate concern to the University and his views have at least an arguable basis of support in other sources (e.g., student evaluations of plaintiff's teaching ability). In a process that invites candid assessment of the suitability of candidates for tenure, the fact that a faculty member opposes tenure and offers a critical assessment of the candidate's qualifications is, standing alone, hardly sufficient to establish malice. *See Purisch v. Tennessee Tech. University,* 76 F.3d 1414, 1420 (6th Cir.1996) (tenure committee's adverse actions could not be considered evidence of malice). As the court noted in *Turner:*

> If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

*Id.,* 722 P.2d at 1113. In the absence of evidence that could reasonably support a finding of actual malice, Dr. Grimes is entitled to judgment as a matter of law on the defense of qualified privilege.

■■■ The defendants are likewise entitled to judgment as a matter of law on the claim for "Intentional and Malicious Interference with Tenure Process." Liberally construed, this count alleges the tort of interference with prospective business advantage. *See Brown Mackie College v. Graham,* 768 F.Supp. 1457, 1460 (D.Kan.1991) (setting forth elements), *aff'd,* 981 F.2d 1149 (10th Cir.1992). As the Supreme Court noted in *Turner, supra,* "[o]ccasions privileged under the law of defamation are also occasions in which interference with contractual relations

may be considered justified or privileged." *Id.*, 722 P.2d at 1116 (*citing* Prosser & Keeton on Torts § 129, p. 989 (5th Ed.1984). *See also id.* (*citing Leibowitz v. Szoverffy*, 80 A.D.2d 692, 436 N.Y.S.2d 451 (1981) (summary judgment granted in tortious interference claim against department chair who opposed plaintiff's bid for tenure). For the same reasons previously expressed, the court finds that the alleged interference by Drs. Pearce and Grimes in opposing plaintiff's tenure application is protected by qualified privilege and that plaintiff has failed to cite sufficient evidence of malice to establish a genuine issue of fact for trial.

### E. *Gross Negligence.*

 Plaintiff alleges that Dean Nicholls was grossly negligent in several respects, such as by representing to plaintiff that the mid-term review was important, by representing that plaintiff was "on track" for tenure, by failing to tell plaintiff his alleged teaching deficiencies would negatively impact his bid for tenure, and by misrepresenting the tenure evaluation process and his role in it. Doc. 1 at pp. 6–9.

The Kansas Tort Claims Act provides in part:

A governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from:

\* \* \* \* \* \*

(e) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved; ...

K.S.A. § 75–6104. Even assuming Dean Nicholls had a legal duty to counsel and advise the plaintiff about the matters complained of, the court concludes this was a discretionary duty falling within the exception from liability in § 75–6104(e). The manner, extent and substance of advice given by a Dean to a tenure candidate is certainly a matter of discretion and judgment not subject to any precisely drawn legal standard. *Cf. Hopkins v. State*, 237 Kan. 601, 610, 702 P.2d 311 (1985) ("Discretion implies the exer-

cise of discriminating judgment within the bounds of reason. [Citation omitted.] It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations.") As such, the Dean is immune from liability for his alleged failure to properly carry out that duty and is entitled to judgment as a matter of law. Plaintiff's claim against the University based on the conduct of Dean Nicholls is likewise barred by K.S.A. § 75–6104.

### III. *Conclusion.*

The defendants' motion for summary judgment (Doc. 25) is hereby GRANTED. The clerk is directed to enter judgment of dismissal in favor of the defendants. IT IS SO ORDERED.